STATE of South Dakota, Plaintiff
and Appellee,

v.

Lewis ASHKER, Defendant
and Appellant.

No. 15389.

Supreme Court of South Dakota.

Argued Feb. 18, 1987.

Decided Aug. 19, 1987.

Jon R. Erickson, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Thomas E. Alberts, Avon, for defendant and appellant.

SABERS, Justice.

Lewis Ashker (Ashker) appeals his conviction for first-degree murder. We affirm.

### Facts

Jerry Plihal (Plihal) was found dead on the living room floor of his Delmont, South Dakota home on June 16, 1985. He died as a result of multiple stab wounds. The State's witnesses placed the time of death somewhere between 6:30 p.m. on Thursday, June 13, 1985 and 2:30 a.m. on Friday, June 14, 1985.

The State's case was purely circumstantial. No fingerprints were found inside the house and no murder weapon was ever recovered. Ashker did not testify nor did he present any witnesses. The State linked Ashker to the incident in Delmont through his association with co-defendant Kurt A. Novaock (Novaock), a former neighbor of Plihal in Delmont.

Ashker and Novaock were residents of Wayne, Nebraska. The State's witnesses testified that Novaock was seen in Delmont on the evening of June 13, 1985, accompanied by an unidentified man. Novaock and his companion were driving around the vicinity of Plihal's house in a vehicle alternately described as a light green or turquoise green pickup truck or a white van. One witness described Novaock's companion contrary to Ashker's appearance. None of the State's witnesses identified Ashker as Novaock's companion. Additionally, there were witnesses who testified that they had seen Plihal alive as late as 6:30 p.m. on Friday, June 14, 1985.

According to the deposition testimony of Novaock's wife, Sharon, Ashker and Novaock were together at the Novaock residence in Wayne, Nebraska, on the afternoon of the murder. Sharon left the house at 3:00 p.m. and when she returned at 5:00 p.m., Ashker and Novaock were gone. Earlier that afternoon, Ashker's green pickup truck had been parked in Novaock's driveway. The truck belonged to Ashker's

wife. It was also gone when Sharon returned. She stated that Novaock got home late that night. She further stated that she had a conversation with Ashker at his home on June 14, 1985. Sharon questioned him about where he and her husband had been the previous night. Ashker stated that they had gone to Omaha, Nebraska and had gotten into a "discussion" with some guys at a Burger King restaurant. He did not say what the discussion was about. On June 19, 1985, law enforcement officers interviewed Ashker in St. Luke's Hospital, Sioux City, Iowa, as to his whereabouts on June 13, 1985. Ashker stated that he and Novaock had gone to Laurel, Nebraska and Omaha, Nebraska. He further stated that he had an accident with his pickup truck in front of a liquor store in Laurel.

Following Plihal's death, law enforcement searched the area outside of his residence. They recovered some paint chips found near a bent clothesline pole. The damage to the pole corresponded with damage on the right rear bumper and tailgate of Ashker's pickup truck. The paint chips were compared to paint from the tailgate. Both exhibited a surface topcoat of metallic green with a grey primer. White paint was also taken from the pole and compared to white paint from a scrape on the bumper of the Ashker pickup. Both contained a single layer of white paint over rust. At trial, the State's expert testified that the paint chips may have come from Ashker's tailgate but that he could not tell conclusively. No bloodstains were found inside Ashker's pickup truck.

On December 3, 1985, Ashker and Novaock were indicted for Plihal's murder. They were tried separately. Ashker's jury trial was held on June 2–10, 1986. The jury found him guilty of first-degree murder in violation of SDCL 22-16-4. Ashker was sentenced to life imprisonment.

### Ashker's Claims

Ashker's assignments of error include: the State's impeachment of its own witness, prosecutorial misconduct, insufficiency of the evidence, denial of motions for judgment of acquittal, the jury instruction on aiding and abetting, and change of venue.

### 1. IMPEACHMENT OF STATE'S OWN WITNESS

Prior to trial, the State took Sharon Novaock's deposition in Wayne, Nebraska. She stated that on the afternoon of June 13, 1985, her husband was wearing tan pants and a black tee shirt. She further stated that the following morning, these clothes were in the laundry basket without any blood on them. Sharon denied that she ever told anyone that she destroyed the clothes her husband was wearing on June 13, 1985.

Sharon was unable to testify at trial due to health reasons. Following an in-chambers hearing, the State read an edited version of her deposition into the record which included the above statements. This occurred despite repeated defense objections. The State then called Lisa Jensen (Jensen) who was a former neighbor of the Novaocks in a Wayne, Nebraska trailer court. Jensen related a conversation she had with Sharon Novaock in June of 1985. Jensen testified that Sharon came over to Jensen's mobile home and told her and several others that Novaock came home with blood on his clothes and boots, and that Sharon either burned them or threw them away. Before the jury heard this evidence, the trial court gave a limiting instruction which advised them that Jensen's testimony was offered solely to impeach the credibility of Sharon Novaock and that it was not proof of Ashker's guilt or innocence.

Ashker claims that Sharon Novaock was used as a "strawman" to get Jensen's otherwise inadmissible hearsay before the jury. *State v. Gage*, 302 N.W.2d 793 (S.D. 1981); *State v. Rufener*, 401 N.W.2d 740 (S.D.1987) (*Rufener II*). He argues that despite the fact that the State may be permitted to impeach its own witness, SDCL 19-14-8, this does not allow the rule to be used as a mere subterfuge to get to the jury evidence otherwise inadmissible. *Gage*, 302 N.W.2d at 799, *citing United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975); *Rufener II, supra* at 744.

Ashker claims that such "back dooring" of hearsay denied him a fair trial.

In *Gage*, we adopted the four-point test set out in *United States v. Rogers*, 549 F.2d 490 (8th Cir.1976), which must be satisfied before prior inconsistent statements may be used for impeachment at trial.[1] 302 N.W.2d at 798. As noted in *Rufener II*, the *Gage* decision added another requirement by adopting the *Morlang* rule which prohibits impeachment of one's own witness when it is used as a subterfuge to get otherwise inadmissible evidence before the jury. 401 N.W.2d at 743–744. This court has applied the *Morlang* rule as a limitation to SDCL 19–14–8 which provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." *Id.* at 744.

A review of the factual circumstances surrounding the witnesses' testimony in *Gage* and *Rufener II* is necessary in resolving this issue. In *Gage*, the prosecutor asked the defendant on cross-examination whether he had telephoned his girl friend and admitted the robbery in question. He denied this. On rebuttal, the State called defendant's girl friend *only* to question her about whether the defendant told her about his alleged intent to commit the robbery, and whether she told the informant about this conversation. The girl friend denied any such conversations. The State then called the informant as a witness to testify that the girl friend had in fact had such a conversation with her. This testimony was admitted by the trial court on the basis of impeaching the girl friend through a prior inconsistent statement. 302 N.W.2d at 798. In reversing defendant's conviction, we wrote:

[T]his case is one in which a witness (the girl friend) was called by the State only to serve as a 'strawman' for the introduction of inadmissible hearsay (by the informant). The State called the girl friend on the pretense of having her impeach [defendant], but she did not do so, and there is nothing in the record to indicate that the State actually thought she would do so.

*Id.* at 799.

In *Rufener II*, the State called defendant's girl friend who denied making statements to a law enforcement agent about the defendant's own statements of drug involvement and distribution. The State then called the agent who testified over hearsay objection that the girl friend told him that defendant stated he was bringing hundreds of pounds of marijuana into South Dakota. 401 N.W.2d at 742.[2]

In holding the agent's so called "impeachment testimony" improper under *Gage* and its adoption of the *Morlang* rule, we found that the prosecution knew before the testimony was presented to the jury that the girl friend was going to deny making the statements to the agent. *Id.* at 745. We further found that the prosecutor knew full well what the girl friend was going to say and in fact depended on her denial to gain admittance of the inadmissible hearsay through the agent's testimony. *Id.* In *Rufener II*, we quoted with approval from *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984), which discussed Rule 607 of the Federal Rules of Evidence (SDCL 19–14–8), and provides in part:

[I]t would be an abuse of the rule, in a criminal case, for the prosecution to call a witness that it knew would not give useful evidence, just so it could introduce

---

**1.** The *Rogers* four-point test requires:
 1) *Inconsistency:* The statements must be inconsistent.
 2) *Relevancy:* The inconsistency must "relate to a matter of sufficient relevancy that the prosecution's case will be adversely affected if the inconsistent testimony is allowed to stand."
 3) *Compliance with Rule 613* (SDCL 19–14–24 and 19–14–25): The prior statement must, on request, be shown or disclosed to opposing counsel, and "if extrinsic evidence is to be used to prove the prior statement, the witness must be afforded an opportunity to explain or deny it, and the opposing party must have an opportunity to interrogate the witness about it."
 4) *Limiting instructions:* The trial court "must adequately instruct the jury about the limited purpose for which the prior inconsistent statement is admitted."
549 F.2d at 495–497.

**2.** *See also State v. Rufener*, 392 N.W.2d 424 (S.D.1986) (*Rufener I*).

hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it. The purpose would not be to impeach the witness but to put in hearsay as substantive evidence against the defendant, which Rule 607 does not contemplate or authorize.

*Id.* 401 N.W.2d at 744. Following the *Webster* rationale, it is clear that the witnesses (i.e., the girl friends), in *Gage* and *Rufener II* were called solely to deny statements attributed to the respective defendants to enable the prosecution to introduce hearsay evidence against them.

■ Here, Jensen's testimony did not serve solely to introduce hearsay evidence against Ashker under the guise of impeaching Sharon Novaock. Jensen's statements directly contradicted Sharon's own testimony about the alleged condition and destruction of her husband's clothes. Sharon's deposition testimony presented useful and important prosecution evidence by placing Ashker with Kurt Novaock on the afternoon of the murder and establishing that Ashker was driving a green pickup truck. It further showed that the Novaocks were former neighbors of Plihal. The State's other witnesses testified that Novaock was seen in Delmont on June 13, 1985 with an unidentified man. Sharon's testimony linked Ashker to Novaock, and by inference, to Plihal, which was critical and relevant evidence in this circumstantial case. Unlike *Gage* and *Rufener II*, the State did not offer Sharon's testimony solely for her denial of the alleged conversation with Jensen.

In *United States v. DeLillo*, 620 F.2d 939 (2d Cir.1980), the defendants appealed their convictions for conspiracy to defraud in the construction of a federally funded sewer project. *Id.* at 942. DeLillo claimed that the government improperly impeached its own witness, Monahan, by eliciting testimony from him in order to impeach him with otherwise inadmissible testimony. *Id.* at 946. The court stated:

Beyond doubt, Monahan was not called to the stand by the government as a subterfuge with the primary aim of getting to the jury a statement impeaching him. Monahan's corroborating testimony was essential in many areas of the government's case.... *Morlang* itself explicitly recognizes the propriety of impeachment where it is 'necessary to alleviate the harshness of subjecting a party to the mercy of a witness who is recalcitrant or may have been unscrupulously tampered with.' (citations omitted) To the extent that defendants rely on *Morlang* for the principle that a witness cannot be put on the stand if the side calling him knows that he will give testimony that it will have to impeach, it seems clear to us that the effect of Fed.R.Evid. 607, codifying the right to impeach one's own witnesses without special restriction, is to nullify the plausibility of such a reading. The *Morlang* opinion itself recognizes that enactment of Fed.R.Evid. 607 might have such an effect. (citations omitted)

*Id.* at 946–947.

Similarly to *DeLillo*, Sharon's testimony corroborated essential aspects of the State's case. In addition, the testimony elicited by Ashker's counsel appears to have also furthered the defense's theory. Under cross-examination, Sharon stated that she was familiar with one Teddy Biggerstaff who committed suicide in October of 1985. She said that she saw him three or four times in June of 1985. Sharon testified that a shirt which was found under Plihal's body looked like one Biggerstaff wore in May 1985. The totality of Sharon's deposition testimony suggests that she was not called merely as a "strawman."

Although not directly related to the propriety of the impeachment, we note that Jensen was thoroughly cross-examined by defense counsel. The record shows that she admitted she could not remember when the alleged conversation with Sharon Novaock occurred and that it could have happened in August of 1985. Jensen agreed that Ashker's name was never mentioned during the conversation. She further admitted that she did not talk to law enforce-

ment officers about the conversation until December 16, 1985, which was after her husband was charged with arson. Jensen admitted that she was testifying pursuant to a plea-bargain arrangement concerning her husband. Her own credibility was put into issue as well.

More important here in distinguishing *Gage* and *Rufener II*, is that the impeaching testimony is Sharon's own statements that she saw the bloody clothing and destroyed it—not the defendant's (or even her own husband's) statements to her that he destroyed the bloody clothes. Therefore, the impeaching testimony relates to Sharon's own actions and observations—not to admissions claimed by the State to be made to her by defendant of his own actions and observations.

Although this testimony was important to the State, it did not unfairly burden the defense as did the impeachment testimony in *Gage* and *Rufener II*. In those cases, the testimony probably coerced and forced them to take the stand to rebut their "own" prior statements made to a "confidant." Here it did not. Ashker could and did remain silent. Ashker retained his defenses, among others, of identification and that he did not participate with Novaock. Ashker also retained the arguments that 1) Jensen's credibility was lacking, 2) that the story was made up for leniency for her husband, and 3) even if Sharon's credibility was impeached, the testimony could not be used to implicate Ashker—only Novaock. This analysis indicates that the use of Jensen's testimony was not limited to impeachment—but probably used substantively as well.

Based on the foregoing, we hold that the impeachment of Sharon Novaock was proper under *Gage* and *Rufener II*, in that it was not offered as a mere subterfuge to get inadmissible hearsay before the jury.[3]

---

3. We acknowledge that a line of cases developed in Illinois may be more logical than the *Rogers* four-point test and the *Morlang* pretense rule. In *People v. Weaver*, 92 Ill.2d 545, 65 Ill.Dec. 944, 442 N.E.2d 255 (1982), the state attempted to prove that an extramarital affair was in part the defendant's motivation for murder. The alleged lover's characterization of the relationship as infatuation was impeached with prior testimony suggesting the defendant and witness had been in love. The *Weaver* court stated:

> A ... witness, ... cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. *See People v. Johnson* (1929), 333 Ill. 469, 165 N.E. 235; *People v. Chitwood* (1976), 36 Ill.App.3d 1017, 344 N.E.2d 611; McCormick, Evidence, sec. 36 (2d ed. 1972).

*Id.* 65 Ill.Dec. at 951, 442 N.E.2d at 262–63.

If the above test of damage versus nonsupport were applied to the testimony of Sharon Novaock, it would appear her impeachment by the State would be improper. Sharon Novaock's denial of the existence or subsequent destruction of any bloodied clothing belonging to her husband did not contradict any evidence presented or about to be presented by the State.

The State had no evidence as to the existence or subsequent destruction of any bloodied clothing of Novaock, other than the hearsay statement presented by Jensen, and the inference raised by the blood spatter pattern testimony of the coroner. Therefore, Sharon Novaock's testimony merely failed to support the position of the State as to the inference sought to be established. It also should be noted that the State was dependent upon the testimony of Sharon Novaock to establish that Ashker and Novaock were together in the early evening of June 13th. Impeachment serves to question the credibility of a witness. It is not so subtle a tool that the impeaching party may designate some parts of a witness' testimony credible and other parts incredible.

Under the *Weaver* test, the improper impeachment of Sharon Novaock would be error. Whether such error would be harmless or prejudicial cannot be clearly determined using the *Weaver* test. In *People v. Johnson*, 138 Ill. App.3d 980, 985–86, 93 Ill.Dec. 332, 336, 486 N.E.2d 433, 437 (1985), the court found reversible error where the witness denied hearing the defendant make a confession and was impeached by a state investigator. The court stated:

> Where the evidence is closely balanced or the error is of great magnitude, a reviewing court will grant relief so long as the jury's verdict may have resulted from the error.

Because *Johnson* may be distinguished from the impeachment at issue herein, we are not prepared to adopt the above reversible error test as the rule in this state.

We concede the *Weaver* rule to be more logical, objective, and easier to apply than the *Mor-*

*Morlang, supra.* The trial court instructed the jury that Jensen's testimony was offered solely to impeach Sharon Novaock's credibility. Even though this evidence was properly admitted, whether it was in fact used by the jury solely for impeachment purposes is another question. *See* point 3, *infra.*

## 2. PROSECUTORIAL MISCONDUCT

Ashker claims that the cumulative effect of the following incidents of prosecutorial misconduct denied him a fair trial.

—The impeachment of Sharon Novaock.

—The testimony of a television reporter.

—The State's presentation of the knives.

—The State's failure to sequester witness Eileen Plihal Gall, the victim's daughter, pursuant to court order.

—The State's failure to comply with SDCL 23A–24–2(2) on opening statement.

██ Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods. *People v. Wiley,* 57 Cal. App.3d 149, 129 Cal.Rptr. 13, 21 (1976); *People v. Gilliam,* 41 Cal.App.3d 181, 116 Cal.Rptr. 317, 326 (1974). In *Maldonado v. State,* 265 Ind. 492, 355 N.E.2d 843 (1976), the Supreme Court of Indiana established a procedure for considering the problem of a prosecuting attorney's alleged improper conduct at trial. *Id.* at 848. Initially, the court determines whether the prosecutor in fact engaged in misconduct by reference to case law and the disciplinary rules of the Code of Professional Responsibility. The court then considers whether, under all the circumstances, the misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Id.* The court wrote:

Whether the misconduct results in subjecting the defendant to 'grave peril' is determined by the probable persuasive effect of the misconduct on the jury's decision, not by the degree of impropriety of the conduct [citation omitted].

Even if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result. [citations omitted]

*Id.*

For the reasons stated below, we are not convinced by this record that the State's actions amounted to prosecutorial misconduct within the meaning of *Maldonado,* nor that the cumulative effect of Ashker's claimed errors denied him a fair trial. *See State v. Dokken,* 385 N.W.2d 493 (S.D. 1986).

*Impeachment of Sharon Novaock.*

The impeachment was proper. *See* point 1, *supra.*

*Testimony of a Television Reporter.*

Ashker was interviewed by television reporter Linnea Carlson (Carlson) on December 12, 1985. She was later subpoenaed by the State to testify at trial. The State did not interview Carlson prior to her testimony. The trial court had granted Ashker's prior motion to exclude evidence of prior convictions. During trial, the State asked Carlson, "Was there anything else you remember about the interview you conducted?" She replied, "I asked him if he had been convicted before of anything." Defense counsel immediately objected and a hearing was conducted outside the presence of the jury. Carlson was not permitted to give Ashker's reply to the question.

During the in-chambers hearing, defense counsel moved for a dismissal with prejudice or a mistrial, arguing that the State's willful violation of the court's order prohibiting evidence of Ashker's prior convictions unduly prejudiced him. The State responded that it had no indication from Carlson's notes, or the edited version of the videotaped interview with Ashker, that she had talked with him about prior convictions. In denying defense counsel's motions, the trial court found Carlson's statement unsolicited and unexpected by the State.

---

*lang* rule. We commend its use by the trial courts of this state. We also note that neither rule eliminates the necessity of determining the

damage or prejudice, if any, resulting from admission of improper impeachment testimony.

■ "It is axiomatic to a fair trial that the state obey the court's orders concerning the conduct of the trial." *State v. Sahlie*, 90 S.D. 682, 688, 245 N.W.2d 476, 479 (1976); *Gage, supra* at 797. The prosecutor's overriding obligation is to see that the defendant receives a fair trial. *Sahlie, supra.* Under the facts of this case, the evidence supports the trial court's ruling that Carlson's remark was unexpected by the State and that the State had no way of knowing from the available information that she discussed prior convictions with Ashker. The record does not suggest that the State intentionally solicited this information to prejudice Ashker or that it flagrantly violated the court's order.

### Presentation of the Knives.

During trial, the State marked but did not admit into evidence three knives which included: a kitchen knife found in the decedent's house, a buck knife found in Ashker's house, and a knife found in a road ditch south of Tripp, South Dakota. Ashker claims that by getting the knives before the jury, the State made a calculated attempt to persuade them that one or more of the knives were used in the commission of the crime. The State argues that the knives were presented to show that it thoroughly investigated any evidence which might have had a bearing on the case.

■ Following an in-chambers hearing during trial, the court, as requested by defense counsel, ordered the knives removed from the jury's presence and cautioned them in part as follows:

> The Court will admonish you at this time that none of these three knives are the murder weapon; that none of these knives have any probative value whatsoever in this case. And you are absolutely instructed to disregard having seen or viewed or heard any testimony whatsoever concerning any of those three knives. And that information you are hereby ordered to put out of your minds.

The evidence shows that the jury was advised at all stages of the proceedings that no murder weapon would be produced. Considering this fact and the trial court's admonishment, we find that the State's conduct concerning the knives does not reflect an attempt to persuade the jury through deception or by reprehensible means. *Gilliam, supra.*

### Failure to Sequester Eileen Plihal Gall.

The trial court granted Ashker's sequestration motion for *voir dire*, opening statements, and during trial. *See* SDCL 19–14–29. The State informed Mrs. Gall, the victim's daughter, that she was sequestered. Although she was not in the courtroom during opening statements, Mrs. Gall was present during the *voir dire* examination. There is no doubt that this witness violated the court's sequestration order. However, Ashker has failed to show how Mrs. Gall's conduct prejudiced him and how her actions were related to or caused by prosecutorial misconduct.

### Compliance with SDCL 23A–24–2(2) on opening statement.

After the prosecutor's opening statement, defense counsel moved the trial court in-chambers to order the State to resume its opening and to set out *all* the evidence it intended to present to the jury during the course of the trial. This motion was based on SDCL 23A–24–2(2).[4] The court ruled that a detailed explanation of all the State's evidence during the opening statement would be prejudicial to Ashker in the event that the State failed to get the evidence admitted. Anticipating evidentiary problems and citing defense counsel's failure to offer authority in support of his position, the court denied the motion.

■ Under SDCL 23A–24–2(2), the prosecutor is required to make an opening statement and "offer the evidence in support of the indictment or information[.]" The statute does not say *all* the evidence. We interpret this statute to require the

---

4. SDCL 23A–24–2 provides in part:
 After a jury has been impaneled and sworn, a trial must proceed in the following order:
 . . . . .

(2) The prosecuting attorney ... must make an opening statement and offer the evidence in support of the indictment or information;
. . .

State to briefly outline what it intends to prove at trial. It does not require a comprehensive statement of each and every prospective witness' testimony. We also agree with the trial court that subsequent problems concerning foundation and admissibility might serve to prejudice the defendant. Accordingly, we hold that these matters do not constitute prosecutorial misconduct, either individually or cumulatively.

3. SUFFICIENCY OF EVIDENCE FOR CONVICTION AND DENIAL OF MOTION FOR JUDGMENT OF ACQUITTAL

Ashker moved for judgment of acquittal at the close of the State's case, after all the evidence was in and the instructions were settled, and following the jury verdict. In each instance the motion was denied. Ashker argues that the motion was warranted because the State's evidence, all of which was circumstantial, was insufficient to support a jury verdict of guilt beyond a reasonable doubt.

 When ruling on a motion for judgment of acquittal, the trial court must consider the evidence in the light most favorable to the nonmoving party who is also given the benefit of all reasonable inferences in their favor. *State v. Wellner*, 318 N.W.2d 324, 332 (S.D.1982); *State v. Gallegos*, 316 N.W.2d 634, 638 (S.D.1982); *State v. Vogel*, 315 N.W.2d 321, 322 (S.D.1982). A motion for judgment of acquittal is properly denied if the State has introduced evidence which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt for the crime charged. *State v. Halverson*, 394 N.W.2d 886, 887 (S.D.1986); *Wellner, supra; State v. Moeller*, 298 N.W.2d 93, 94 (S.D.1980).

 In *State v. Esslinger*, 357 N.W.2d 525 (S.D.1984), we wrote:

The established rule in this state is that to warrant conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with guilt of the party charged, and such as cannot by any reasonable theory be true and the party charged be innocent.

*Id.* at 530–531, *quoting State v. Thomas*, 78 S.D. 568, 574, 105 N.W.2d 549, 552 (1960).[5] The State may prove all elements of a crime, including intent, with circumstantial evidence. *State v. Cody*, 323 N.W.2d 863, 869 (S.D.1982); *Wellner, supra* at 332. "It is not necessary to exclude every possible hypothesis of innocence to support a conviction based on circumstantial evidence." *State v. Robb*, 303 N.W.2d 368, 371 (S.D.1981). Our review of the sufficiency of the evidence in a circumstantial evidence case is considered in a light most favorable to the verdict. A guilty verdict will not be set aside if the State's evidence, considering all favorable inferences to be drawn therefrom, supports a rational theory of guilt. *State v. Dale*, 360 N.W.2d 687, 690–691 (S.D.1985); *State v. Deubler*, 343 N.W.2d 380, 382 (S.D.1984); *Robb, supra; Luna, supra* at 264 N.W.2d 488; *State v. Dietz*, 264 N.W.2d 509, 511 (S.D.1978).

 With the foregoing principles in mind, we turn to the facts of this case. The State's evidence showed that:

-Plihal died of multiple stab wounds and was found on June 16, 1985, dressed in the clothes he wore to cut down a tree on the afternoon of June 13, 1985.

-The State's expert testified that of the multiple stab wounds, there were slashing wounds to the throat which nearly severed the jugular vein.

-Four of the State's witnesses observed a green pickup truck in the vicinity of Plihal's house between 7:00 p.m. and 7:30 p.m. on the evening of June 13, 1985. All of them identified Novaock in the passenger's seat and observed the unidentified driver. One of these witnesses said the truck had Nebraska plates.

-Another State's witness described Novaock in a white van with an unidentified driver at around 7:30 p.m. on June 13, 1985.

5. *See also State v. Luna*, 264 N.W.2d 485, 488 (S.D.1978), which used the language "any rational hypothesis," rather than "any reasonable theory."

-Ashker and Novaock left Wayne, Nebraska between 3:00 and 5:00 p.m. on June 13, 1985.

-Ashker was driving his wife's green pickup truck.

-Novaock's neighbor observed Novaock and Ashker together in Ashker's pickup truck just outside of Wayne, Nebraska between 5:30 and 6:30 p.m. on June 13, 1985.

-Ashker told conflicting stories as to his whereabouts on the evening of June 13, 1985.

-The Laurel, Nebraska police reported no accident in front of a liquor store on June 13, 1985, as claimed by Ashker.

-The Omaha, Nebraska police reported an altercation at a Burger King on the *morning* of June 13, 1985, not during the late evening hours as stated by Ashker.

-The damage to Plihal's clothesline pole corresponded with damage found on the tailgate of Ashker's pickup truck.

-The analysis of the paint chips, although inconclusive, suggested a strong similarity between the paint on the clothesline pole and the paint from a scrape on the bumper of Ashker's pickup truck.

-Plihal's wallet was found in a ditch north of Delmont possibly indicating that the assailant(s) attempted to leave a false trail.

Ashker maintains that the State's evidence was insufficient to find him guilty of first-degree murder: no murder weapon was discovered nor fingerprints found, no blood was found in Ashker's pickup truck, none of the State's witnesses identified Ashker as Novaock's companion, and comparison of the hair samples taken from the victim's neck and hands with those from Ashker's head was inconclusive. Ashker relies in substantial part upon the testimony of witness Albert Ehresman who testified that he saw Plihal raking hay at 4:30 p.m. on Friday, June 14, 1985. The evidence shows that Ashker was in Wayne, Nebraska on this date. Ehresman claimed he photographed Plihal at this time and testified that he was sure that the pictures were taken on Friday afternoon. However, Ehresman's pictures were not dated and he did not know when the film was developed.

Under appellate review of a circumstantial evidence case, " 'we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' " *Luna, supra* at 488, *quoting, State v. Allen,* 237 N.W.2d 154, 161 (N.D.1975). Here, the jury was instructed on circumstantial evidence [6] and they returned a guilty verdict against Ashker. We may not, as a matter of law, set aside this verdict for insufficiency of the evidence if the evidence sustains some rational theory of guilt. *Luna, supra* at 488.

For the purpose of this motion we assume that the impeachment testimony of Jensen concerning the bloody clothing was used not only for impeachment, but *substantively* by the jury. *See* discussion in point 1, *infra.* Considering the evidence in the light most favorable to the verdict and even excluding Jensen's testimony concerning the clothes, we conclude that the evidence supported a rational theory of guilt. *Dale, supra.* The State's evidence and all reasonable inferences drawn therefrom, was sufficient, although incredibly close, to sustain Ashker's conviction. Accordingly, the motion for judgment of acquittal was properly denied.

## 4. SUFFICIENCY OF EVIDENCE TO WARRANT INSTRUCTION ON AIDING AND ABETTING

Ashker objected to the trial court's instruction on aiding and abetting. Instruction # 23 provided in full as follows:

---

**6.** Instruction # 10 provided in part:

In a case such as this where the case of the state rests entirely on circumstantial evidence, you are not permitted to find the defendant guilty of any of the crimes charged against him unless the proved circumstances are not only consistent with the guilt of the defendant, but also cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt.

If all the facts and circumstances shown can be reasonably accounted for upon any theory consistent with the innocence of the defendant, the jury must acquit the defendant.

All persons who directly commit the act(s) constituting the crime or who aid and abet in its commission, although not present, are considered as principals in the crime thus committed and are equally guilty.

A person aids and abets the commission of a crime if he with the intent to promote or facilitate the commission of a crime, aids, abets, or advises another person in planning or committing the crime.

So in this case if you should find beyond a reasonable doubt that one person committed the offense charged and the other aided and abetted the commission of such crime, both would be guilty thereof.

So in this case if you should find beyond a reasonable doubt some of the defendants committed the offense charged and others aided and abetted the commission of such offense, each would be guilty thereof.

The court further instructed the jury that the mere presence of the defendant at the scene of a crime was insufficient to make him an aider and abetter.[7]

Ashker claims that the State's evidence, at best, shows that: he and Novaock were driving around Delmont, South Dakota on the evening of June 13, 1985, they were at the decedent's residence sometime that night, and they left Delmont and returned to Wayne, Nebraska at about 4:00 a.m. on June 14, 1985.

Ashker is correct that his mere presence at the Plihal residence does not automatically make him an aider and abetter. However, it is one circumstance that tends to support a finding that he was a participant, which, along with all the other circumstantial evidence mentioned above, can establish his guilt. *Robb, supra* at 371; *State v. Schafer*, 297 N.W.2d 473, 476 (S.D.1980). If the jury instructions as a whole adequately set forth the applicable law, the accused has not been prejudiced. *Wellner, supra* at 332. Considering the jury instructions as a whole, Instruction # 23 was warranted by the evidence and properly instructed the jury on aiding and abetting.

## 5. CHANGE OF VENUE

Ashker made a motion for a change of venue from Douglas County, South Dakota which was denied. He also moved for a public opinion survey which was similarly denied. Ashker contends that the testimony of the former Douglas County State's Attorney provided competent evidence that a fair and impartial jury could not be obtained in Douglas County. At the hearing on the motion, the former state's attorney expressed the opinion that Ashker could not receive a fair trial and that the sheriff had actively discussed the case with citizens of the county.

The trial court may order a change of venue if it appears that a fair and impartial jury cannot be had in the county where the prosecution is pending. SDCL 23A–17–5; *Wellner, supra* at 330. The law presumes that a defendant can receive a fair trial in the county where the offense was committed. *State v. Luna*, 378 N.W.2d 229 (S.D.1985). The test is whether there is, in fact, prejudice in the minds of the county residents to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in the county. *Id.* at 236; *Wellner, supra* at 330–331. Here, the burden was on Ashker to establish the need for a change of venue. The decision to grant the motion was discretionary with the trial court. Therefore, we will reverse the court's ruling only for an abuse of discretion. *Wellner, supra.*

7. Instruction # 24 provided:
You are instructed that the mere presence alone of the defendant at the scene of the crime is not sufficient to make him an aider and abetter. It makes no difference that one present remained silent, or even acquiesced in the commission of the offense, or even mentally approved of the act.

The presence of a defendant at the scene of a crime is a circumstance which the jury can consider with all of the other facts and circumstances in the case.

In the absence of evidence of participation, a defendant cannot be convicted on the basis of his presence at the scene of the crime.

Under the State's cross-examination at the motion hearing, the former state's attorney admitted that his relationship with both the Douglas County Sheriff and the current State's Attorney was strained. He further admitted that the pretrial publicity from the newspapers and television was essentially factual reporting which did not comment on Ashker's guilt or innocence. He further testified that he had formed his opinion about Ashker's inability to receive a fair trial after speaking with approximately six to ten local citizens with whom he had business contacts. In denying the motion for change of venue, the trial court stated:

> The Court feels that the people that he [former state's attorney] has contacted are not sufficient to determine the question and that voir dire examination of the jurors as they are called in will be sufficient to protect the interests of the Defendant.

We have held that " 'qualified jurors need not be ignorant of facts and issues and that the existence of pretrial publicity alone is not enough to deny a defendant a fair trial.' " *Wellner, supra* at 331, *quoting, State v. Reiman*, 284 N.W.2d 860, 868 (S.D.1979). We agree with the trial court that the *voir dire* examination of prospective jurors was sufficient to protect Ashker's fair trial rights. Ashker did not challenge any of the twelve original jurors ultimately selected from a group of eighty-four for cause. This seriously calls into question Ashker's claim that a fair and impartial trial could not occur in Douglas County. *See Wellner, supra*. Accordingly, we hold that Ashker failed to meet his burden of establishing the need for a change of venue and the motion was properly denied.

We have also considered Ashker's argument concerning denial of the public opinion survey and find it to be without merit.

The judgment is affirmed.

WUEST, C.J., and MILLER, J., concur.

HENDERSON, J., concurs in result without writing.

MORGAN, J., dissents.

MORGAN, Justice (dissenting).

I dissent on the treatment of Issue 1, impeachment of State's own witness. I fully concur in the balance of the opinion.

First of all, I question whether the issue is even preserved for the purpose of appeal. The record reflects that defense counsel objected to the introduction of the testimony as substantive evidence. There was considerable discussion as to Sharon's possible status as a conspirator, an aider, or abetter, or as an unindicted principal, so as to come within the hearsay exception of admissions against interest. At one point in a motion hearing, the trial court said: "Do you come to the same conclusions, Mr. Alberts, on this and feel that the [Jensen] testimony is only admissible through impeachment?" To this, defense counsel, Mr. Alberts, replied: "That's correct, your honor." (Motion Hearing on status of Sharon Novaock, 5–12–86, page 59.) Throughout most of the record, before the deposition was read into evidence, the trial court was withholding its decision on the defense objections because the testimony might be admissible under some theory. But, when it came time to read Sharon's testimony, the court admitted it only for the purpose of impeachment and so instructed the jury. It appears defense counsel acquiesced.

With respect to the discussion on the merits, while the majority would distinguish this case from *State v. Rufener*, 401 N.W.2d 740 (S.D.1987) (Rufener II) and *State v. Gage*, 302 N.W.2d 793 (S.D.1981), I think the differences are only cosmetic. I am concerned that the language used by the majority is too loose and invites prosecutors to evade the "strawman" problem by simply asking some additional questions that may be irrelevant or cumulative.

As the majority opinion held in *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975), the prosecutor may be tempted to get before the jury prior inconsistent statements made by the witness and, while such impeachment might somehow enhance the

truth-finding process, yet this must be balanced against the notion of fairness upon which our system is based. "Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony." *Id.* at 190 (citations omitted). The *Morlang* decision also instructs us in this regard:

> We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for them to distinguish between impeachment and substantive evidence.

*Id.* at 190.

Can there be any question but what the most important information that State sought to extract from Sharon was the bloody condition of her husband's clothing and shoes? Although the majority characterizes it as useful and important prosecution evidence, most, if not all of the testimony which was otherwise adduced from Sharon, was cumulative. There was other testimony linking Ashker to Novaock and the use of the green pickup truck that day. The thing that strikes me, and it seems rather obvious is: Why would a prosecuting attorney, who has a witness delivering all of that useful evidence the majority speaks of, turn around and deliberately attempt to impeach that witness? The only reason possible is that the prosecutor felt it more important to get the otherwise inadmissible hearsay before the jury than to support the veracity of his witness.

The prosecutor certainly was not caught by surprise. Sharon's testimony was presented in deposition form so State was on notice from the time of the taking of the deposition as to what her testimony would be. Nor, does it appear from this record that Sharon was "recalcitrant or unscrupulously tampered with." Sharon appeared to testify freely on every other facet, and the prosecutor did not see fit to attempt to qualify her as a hostile witness, so I distinguish this case from *United States v. De-Lillo,* 620 F.2d 939 (2d Cir.1980), upon which the majority relies.

Nor, can I say that the admission of the evidence was harmless error. This conviction was based entirely on circumstantial evidence. The prosecution was throwing everything before the jury that it could possibly sweep up. The testimony of the blood on Novaock's clothing and shoes was the closest to a "smoking gun" State could come up with and the prosecution was determined to get it before the jury. Ashker might very well have been convicted without Jensen's evidence; but, in my mind, it is certain that he was convicted because of it. I would therefore reverse.