**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Kenneth A. FIELDS, Defendant and Appellant.**

**No. 17540.**

Supreme Court of South Dakota.

Argued March 16, 1992.

Decided July 8, 1992.

Mark Barnett, Atty. Gen., Gary Campbell, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Delmar Walter, Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES/HOLDING

On March 11, 1991, a Minnehaha County jury found Fields guilty of First Degree Manslaughter, in violation of SDCL 22–16–15(3), a Class 2 felony. On May 15, 1991, the circuit court, Second Judicial Circuit, entered a judgment under which Fields was sentenced to sixty-five years in the state penitentiary. Fields filed his notice of appeal from that judgment on May 17, 1991.

Fields raises the following issues on appeal:

1. Did reference by the State during cross-examination and closing argument to Fields' post-arrest silence violate Fields' due process rights? We hold that it did not.

2. Were trial court's jury instructions regarding self-defense proper? We hold that they were.

3. Did the combination of Issues I and II deprive Fields of the right to a fair trial? No. Due to our determinations on Issues 1, 2 and 3, we do not treat this issue in full.

4. Did sufficient evidence exist to support the jury's verdict? Assuredly, it did.

We affirm.

## FACTS

Events surrounding this incident occurred the night of Saturday, October 20, into the early a.m. hours of Sunday, October 21. On Sunday, October 21, 1990, at approximately 1 a.m., defendant-appellant Ken Fields (Fields) stabbed Scott Fodness to death.

Triggering facts, begetting this homicide, began at approximately 9:00 p.m., Saturday night, when Fields and two companions for the evening, Dan Padovani (Padovani) and Wayne Crafton (Crafton), arrived at a bar in Pipestone, Minnesota. All three were co-workers. On the way to this bar, the three mutually shared and consumed a twelve-pack of beer. At this bar and as they departed, they split 10 cans of beer. They left the bar after half an hour, returning to Sioux Falls and proceeded to a local bar, the Pomp Room. They arrived at approximately 11:00 p.m. At the Pomp Room, Fields continued drinking beverages containing alcohol with his companions, and played billiards until 1:00 a.m. Fields was found, at 4:00 a.m. that morning, to have a blood alcohol level of 0.14. Under state law, he is presumed to be under the influence of alcohol.

At approximately 1:00 a.m., Fields and Padovani decided to leave the establishment. Crafton was no longer in their company. As Padovani and Fields neared the exit, Padovani recognized two other co-workers; both Fields and he stopped to talk to the two. Padovani became engaged in a heated conversation with one, Mike McKee (McKee). Padovani and McKee began fighting; it is disputed if the struggle consisted of shoving or fisticuffs. A bouncer at the bar, Russell Doty (Doty), saw this encounter unfold and ordered Padovani out of the bar. He complied. Fields was not involved in the dispute and was not asked to leave.

At this point, the manager of the bar, Jon Ertz (Ertz), followed Padovani outside. As Ertz approached Padovani, Padovani threw Ertz to the ground and broke his thumb. Ertz got up and again approached Padovani, who repeatedly tried to kick Ertz.

Fields, McKee, and Doty (the bouncer) came out of the bar and proceeded to the scuffle. Essentially, the important facts which follow and the intentions of the various parties are in dispute. For sake of

clarity of the parties positions, we set forth the competing versions of the facts.

### Fields Version

Fields asserts that as soon as he went out to the scuffle, he assumed the role of peacemaker/mediator. Fields grabbed Ertz (the bar manager) and Ertz struck him. In testimony, Doty conceded that Fields' actions might be able to be construed as conciliatory. Three other bouncers employed by the bar, Friesth, Bruns and Scott Fodness (Fodness) the homicide victim, came outside. Bruns noticed Ertz and Fodness shoving Padovani and Fields down the sidewalk. Despite Bruns' exhortations to Ertz and Fodness to re-enter the bar, the two remained engaged with Fields and Padovani. At this juncture, the encounter split into two groups, with Fields facing Fodness. Fodness pushed Fields into Dakota Avenue, where the two exchanged blows and then wrestled in the middle of the street. Bruns directed traffic for the two and tried to watch. Bruns saw Fodness pick Fields off the ground, lead him to the other side of the street, and take Fields down to the ground. Fields struggled to get away from Fodness as he was being led across the street. An eyewitness, one Wallin, heard Fodness tell Fields in explicit terms, to depart the area. This occurred as Fodness led Fields across the street. According to Wallin, once across the street, Fodness disengaged, then approached Fields again and the two attempted to hit each other. Fields went to the ground and Fodness came over Fields. Fields then pulled his knife and stabbed Fodness. Fodness had no knife. Fields expresses that he does not remember the sequence of events surrounding the stabbing.

Fields asserted and alleged the testimony shows that he continually retreated from Fodness and that Fodness was the aggressor. He alleged that he was repeatedly struck by Fodness and was in fear for his life. He also alleged that Fodness and the rest of the bouncers continued to scuffle even after Fields' protestations and retreats.

### State Version

State asserts the evidence demonstrates the following sequence of events. When McKee and Fields left the bar, they joined the fight against Ertz. Friesth saw Fields grab or hit Ertz. Then, Fodness pulled Fields off Ertz and told Fields and Padovani to leave. They did not leave and instead swore at the bouncers.

Friesth never saw Fodness hit or push Fields down at any time. Friesth saw what appeared to be blows made by Fields against Fodness as they were across the street. Friesth saw a shiny object, the knife apparently; Fodness then turned, staggered, and collapsed. Doty and Bruns gave similar accounts, although Doty stated both fighters tripped over the curb and fell in some bushes while Bruns stated that Fodness took Fields down to the ground before crying out that Fields had a knife. Neither Friesth, Doty nor Bruns ever saw Fodness strike Fields. Another witness, one Johnson, additionally stated this. Wallin, a witness mentioned above, saw the two wrestling in the street. Wallin saw both men swing at each other. Wallin expressed Fodness took Fields to the ground before the fatal stabbing.

Fodness was taken to a hospital almost immediately where he was pronounced clinically dead. Attempts to revive him were unsuccessful. An autopsy was performed by a pathologist, Dr. Brad Randall. Dr. Randall found four stab wounds; a superficial flesh wound on the chest; a wound to the abdominal cavity; a wound to the liver; and a wound which penetrated the heart and lung. Randall considered this last wound to be the fatal wound. A wound to the webbing of the right thumb was discovered, also apparently inflicted by the knife.

Before Fields was interviewed at the police station, he was read his Miranda rights by two police officers, Officer Mattson and Detective Norlin. A tape of the interview and a transcript of the tape were admitted into evidence. Additionally, at the beginning of the taped interview with Mattson, Fields was again advised of his *Miranda* rights. The following colloquy followed

the reading of the *Miranda* warning, and Fields' affirmation of understanding the rights therein:

DETECTIVE NORLIN: Okay, do you wish to waive these rights and talk to me at this time?

FIELDS: I'll talk to you ... to a certain extent.

The interview proceeded with Fields giving a detailed account of the events that transpired on the evening in question. Norlin then asked Fields later in the interview about the events at the time of the stabbing. Fields then took a different posture.

FIELDS: And until I can get a lawyer, you know, or something, I can't go into that part.

Before this interview with Detective Norlin, Fields was interviewed by Officer Mattson. The following conversation took place:

MATTSON: Did you stab him Ken?

FIELDS: I ain't say'n nothin'.

Preceding this question and answer was a detailed explanation by Fields concerning the incident.

During trial, prosecuting attorney conducted a line of questioning regarding Fields' post-arrest silence involving the stabbing. The prosecutor conducted the following cross-examination:

Q: It's your testimony that you don't remember the stabbing?

A: Yes.

Q: And you recall giving the statement to Detective Norlin?

A: Yes.

Q: The night of the incident?

A: I believe so.

Q: And he inquired of you about the stabbing?

A: Yes, he did.

Q: What did you tell him?

A: I told him I didn't want to talk about anything more.

Q: Is that because you didn't remember it?

A: Pretty much that and plus I didn't want to be—to say anything without my attorney because I know the situations like that could probably be used against me and I didn't have no protection.

This concluded any reference to the issue on cross-examination.

Fields' attorney made a motion in limine at the close of the case asking that State be restricted from anything relative to Fields' post-arrest silence regarding the stabbing. However, he assented to permit the full transcripts to reach the jury, which contained reference to this issue. Trial court denied Fields' motion, in part because the evidence came in without objection, and providing that the State did not argue that Fields was guilty because he asked for an attorney. Trial court did grant Fields' request for a standing objection relative to any reference to Fields' post-arrest silence. Fields was advised (by trial court) that he need not renew his objection in open court. During closing argument, State's Attorney did reference Fields' post-arrest silence. The reference by State's Attorney in closing attempted to emphasize the inconsistency between Fields' statements to the police and those he gave at trial.[1]

---

1. The following is the pertinent text of State's closing argument:

"... Specifically about the specific stabbing incident, where there is a slash and stabs and the defensive wound and so on, he told you folks—he said—he said, I was dazed, were his words. And I was shocked. And that's why I don't recall. That's what he said to you folks. What he said to Officer Mattson was different. What he said to Officer Mattson was he explained everything that occurred—and you may recall the last question that Officer Mattson asked the Defendant. He said, did you stab him, Ken? And do you recall the Defendant's answering, I ain't saying nothing. He didn't say that he was dazed. He didn't say, I'm in shock. He told him all about the self-defense but when it came to did you stab him, I ain't saying nothing. You decide whether that's consistent with the testimony he gave you folks at trial. He was being interviewed by Detective Norlin. At the very beginning of the interview with Detective Norlin he says, are you willing to talk to me about this case. Do you recall his answer? He says, yeah, I'll talk to you to a certain extent. He gave an interview to Detective Norlin and explained to him all the facts and the circumstances leading up to this and then when it came down to the stabbing, when it came down to the stab-

## DECISION

I. *Did reference by the State, during cross-examination of Fields and closing argument, to Fields' post-arrest silence violate Fields' due process rights?*

■ Fields argues that prosecution's cross-examination of Fields affected a substantial right, Fields' right to due process. Fields asserts that he was prejudiced because the introduction of the evidence improperly tended to equate his silence with guilt. Fields claims that the reference in closing to Fields' post-arrest silence, regarding the stabbing, violated Fields' right to due process guaranteed in the Fifth Amendment of the United States Constitution. Fields asserts that it was plain error to allow this issue to be used by State. We have recognized the plain error rule, but only in exceptional cases, and then it must be applied cautiously. The rule does not encompass every error that occurs at trial, but only those which are both obvious and substantial. *State v. Brammer*, 304 N.W.2d 111, 114 (S.D.1981); *State v. Smith*, 344 N.W.2d 505 (S.D.1984).

■ In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court extended the privilege against self-incrimination, to situations where the prosecution uses a defendant's silence at the time of arrest, to impeach a defense subsequently offered at trial. In *Doyle*, the defendants at trial testified to alibi defenses that they had not told previously to the prosecutor or police. The prosecutor then cross-examined the defendants about their failure to give their exculpatory version of the facts to the police at the time of arrest. The Court held "that the use of

impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d at 98.

Therefore, we must distinguish *Doyle* from the case before us. In *Doyle*, the Court held that it was improper to refer to defendant's post-arrest silence, at the time of arrest and after receiving *Miranda* warnings, *for impeachment purposes*. In the case at bar, the State did *not* question Fields about and refer to his post-arrest silence regarding the stabbing *for impeachment purposes*. The State's Attorney's cross-examination of Fields and closing argument was very explicit and specific in that he referred to this issue only to the asserted lack of memory by Fields and generally the inconsistency of trial testimony to post-arrest silence. This was designed to contrast Fields' quite prolific memory of the events in his post-arrest interview, his refusal to discuss the stabbing and his claims of memory loss of those events at trial.

Our conclusions in *Waff v. Solem*, 427 N.W.2d 118 (S.D.1988) are analogous to this case. In *Waff*, the prosecuting attorney alluded in cross-examination and closing argument to Waff's failure to produce an alibi witness. In *Waff*, we stated:

We conclude that the prosecutor's cross-examination questions and comments in his closing argument were directed not at petitioner's refusal to testify or his pre-trial silence, but his failure to produce evidence. Consequently, such questions and comments were not improper....

---

bing he says, I won't talk to you about that without an attorney. And he's entitled to that. That's a very precious rule of law that we all enjoy. He's entitled to that, but I bring that to you because he did not say to Detective Norlin that he was dazed. I was shocked. I don't recall. That's what he said to you folks. He did not say that to Detective Norlin. He says, I'll talk to you to a certain extent and then when the issue of the stabbing came up he refused. Instead, knowing that the interview was being taped—because the tape recorder was laying right in front of him—instead what he said to Detective Norlin was, dude was

trying to do me bodily harm. Bodily harm, Dude was off the bar premises. Dude was off the bar. Bodily harm. Self-defense. That's not what he told you folks about the stabbing. Not, I'm dazed and I'm in shock. And that's why I don't remember what happened. Because he did and he does. The best thing that can be said about his memory that it is self-serving. You decide if this Defendant is trying to say the most correct thing at the most appropriate time. He is trying to say the most appropriate thing to law enforcement. The most appropriate thing to the Members of the Jury when he's here on trial."

*Waff*, 427 N.W.2d at 121. Similarly, in our case, State's Attorney's questions and comments were not directed at Fields' silence concerning the stabbing itself, but focused on Fields' lack of memory. The questions and comments, when examined in context, did not try to impute guilt from Fields' silence, but were used to highlight Fields' prior inconsistent statements.

*Doyle* was further distinguished by the Supreme Court in *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). In *Anderson*, the defendant gave two different stories concerning his theft of a car. In the initial story, a police officer interviewed the defendant shortly after arrest. After receiving *Miranda* warnings, defendant stated he stole the car from a street locale. The second story, elicited at trial, defendant stated he stole the car from an entirely different locale. The *Anderson* court concluded that the questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement. It further stated that "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version." *Anderson*, 447 U.S. at 409, 100 S.Ct. at 2182, 65 L.Ed.2d at 227.

Accordingly, we find that Fields' contentions of violation of due process do not trigger the plain error rule. In the present context of State's Attorney's questions and comments in issue, it is evident that prosecutorial questions and comments did not treat Fields' silence as evidence of guilt. Therefore, no violation of due process attended thereon.

II. *Were trial court's jury instructions regarding self-defense proper?*

 Fields contends that certain instructions given to the jury were not supported by the evidence, thereby trial court erred. It is well settled in South Dakota that a trial court is to present only those issues to the jury by way of instruction which find support by competent evidence in the record. *State v. Weisenstein*, 367 N.W.2d 201, 206 (S.D.1985). On appeal, we review the jury instructions by construing

them together and the instructions are not erroneous, if when so construed, they provide a full and correct statement of the law applicable. *State v. Grey Owl*, 295 N.W.2d 748, 751 (S.D.1980). There is no prejudicial error because a particular instruction did not embody all of the relevant applicable law. *State v. Fender*, 358 N.W.2d 248, 254 (S.D.1984). Appellant bears the burden to show not only error, but also prejudicial error, to the effect that under the evidence, the jury might and probably would have returned a different verdict if different instructions had been given. *Weisenstein*, 367 N.W.2d at 206. Error may not be presumed on appeal. *Fender*, 358 N.W.2d at 254.

 Fields first argued that Instruction no. 20 should not have been given because there was no evidence presented to indicate that Fodness' activities outside the bar were legal. We disagree. Numerous witnesses testified that Fodness' activities were consistent to one who was trying to break up the scuffle. Additionally, witnesses testified that Fodness was coming to the assistance of Ertz, who was one of the initial combatants. Further, testimony indicated that Fodness may have been simply separating the combatants and admonishing Fields and Padovani to leave the premises. We find that competent evidence existed in the record on this score to support Instruction No. 20.

 Fields further attacks Instruction no. 20 by stating that since this instruction was given, trial court should also have given an instruction on simple assault. Fields wanted this instruction to enable the jury to determine the lawfulness of Fodness' actions. However, we have stated that on reviewing instructions we construe them together and when so construed are not erroneous if they present a full and correct statement of the law applicable. *Weisenstein*, 367 N.W.2d at 206. Instruction no. 18 concerns the lawful use of force. Instruction no. 20 concerns the relationship of self-defense to unlawful attack. Instruction no. 21 deals with one who seeks or induces a quarrel and the right to stand one's ground in self-defense against an ad-

versary. Instruction no. 22 concerns an aggressor's right to self-defense under certain circumstances. When we read and construe these instructions as a whole, we find no error by trial court in not giving an instruction on simple assault. *See, Grey Owl*, 295 N.W.2d at 750. Instructions no. 18, 20, 21 and 22, considered with other instructions given by trial court, adequately instructed the jury on the types of force to be considered when used against another person. SDCL 22–18–1, the simple assault provision, is implicitly contained in the instructions by trial court giving other adequate instructions on the concepts of lawful and unlawful force. *See, State v. Huth*, 334 N.W.2d 485, 489 (S.D.1983). Therefore, construing the instructions together, we find that it was not error for trial court to refuse to submit an instruction on simple assault.

Fields next asserts that trial court committed error by giving both Instructions no. 21 and 22, alleging that no evidentiary support existed for them. Fields asserts that these instructions were in error because it was shown by trial testimony that he was not the *initial* instigator of the altercation, i.e., the altercation between Padovani and Fields. However, we must note that the instructions do not contain the provision that Fields had been the person who *initially* instigated the affray, i.e., one involved in the first blows. Further, as we have mentioned, testimony and evidence involving the actions and intentions of the parties are in dispute, but competent evidence exists in the record that Fields may have been an aggressor at various segments of the incident. Additionally, jury instructions apply not only to defendant but to Fodness as well. There is evidentiary support for Instructions no. 21 and 22. A trial court must instruct a jury as warranted by the evidence presented. *Grey Owl*, 295 N.W.2d at 750. We rule that trial court committed no error in submitting these various instructions to the jury.

IV. *Did sufficient evidence exist to support the jury's verdict?* We hold that there was sufficient evidence to support the jury's verdict.

Fields contends that there was insufficient evidence submitted at trial to support a conviction. We do not agree. In reviewing the sufficiency of evidence on appeal, we are limited to determining if there is evidence in the record which, if believed by the finder of fact, will sustain a finding of guilt beyond a reasonable doubt. *State v. Hanson*, 456 N.W.2d 135, 139 (S.D. 1990). We must accept the most favorable inferences that can be drawn from the evidence in support of the verdict. *State v. Baker*, 440 N.W.2d 284, 287 (S.D.1989). In reviewing the evidence to determine if it is sufficient to sustain a conviction, it is not the province of this Court "to resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence." *State v. Faehnrich*, 359 N.W.2d 895, 900 (S.D.1984). We additionally note that Fields made motions for judgment of acquittal during trial. Trial court denied these motions. Trial court is required to consider the evidence in the light most favorable to the nonmoving party who is also given the benefit of all reasonable inferences in their favor (here, the State). *State v. Ashker*, 412 N.W.2d 97, 105 (S.D.1987).

It is undisputed that Fields stabbed Fodness. As a result of these stab wounds, Fodness died. Fields admitted stabbing Fodness at trial. He said he was sorry. The only question then is, did sufficient evidence exist to support the conviction of Fields by violation of SDCL 22–16–15(3)? [2] Unquestionably, there is sufficient evidence. Testimony from witnesses and other evidence is uncontroverted that Fields pulled his knife and stabbed Fodness at least four times, causing his death. Fodness was an unarmed man. Fields

**2.** SDCL 22–16–15 Manslaughter in first degree. Homicide is manslaughter in the first degree when perpetrated:

. . . .

(3) Without a design to effect death, but by means of a dangerous weapon;
SDCL 22–1–2. Definition of terms. Terms used in this title, and in other statutes which

prescribe a penalty for public offense, unless the context otherwise plainly requires, mean:

. . . .

(10) "Dangerous weapon" or "deadly weapon," any firearm, *knife* . . .

would have us believe that Fodness was the aggressor and that there was insufficient evidence presented to the jury to enable them to find beyond a reasonable doubt that the killing of Fodness was not justifiably done in self-defense. We disagree. As we have noted, the facts are in dispute as to the actions and intentions of the parties during the incident. However, we do not resolve conflicts in the evidence. *Faehnrich*, 359 N.W.2d at 900. Nevertheless, we find ample evidence to support the contention that Fields was one aggressor throughout the conflict and that Fodness, while possibly not the calm mediator, certainly acted in no way towards Fields to indicate that Fields was facing a danger which would reasonably justify use of lethal force. This conclusion is supported from the testimony of the eyewitnesses present—Doty, Bruns, Friesth, Wallin and Johnson. We conclude that this evidence, and the evidence noted above and in the record, sustains a finding of guilt beyond a reasonable doubt. *Hanson*, 456 N.W.2d at 139.

Due to our determination on the issues, we need not consider Issue III.

Accordingly, we affirm the judgment of conviction.

MILLER, C.J., and WUEST and AMUNDSON, JJ., concur.

SABERS, J., concurs specially.

SABERS, Justice (concurring specially).

I am troubled by the conduct of the police officers in interrogating the defendant at the police station in excess of two hours without advising the defendant that the victim had died. This is especially troubling in view of the defendant's statement to the officer that he hoped "the dude is not hurt bad." The majority's omission of same appears to condone it.

Deception on the part of law enforcement interrogators goes to the heart of knowing, intelligent, and voluntary statements. Law enforcement is an honorable profession and honesty in fact is not too much to ask of officers dealing with those arrested. Although this deception is not as bad as that of the detective in *State v. Dickey*, 459 N.W.2d 445 (S.D.1990), "such conduct is totally unbecoming of a law enforcement officer of this State, whose sworn duty is to uphold and enforce the law." *Id.* at 451.