No. 95-2250

Michael Wayne, also known as Michael Wayne Fenney,

Plaintiff - Appellant,

v.

Dennis Benson, Warden,

Defendant - Appellee.

Appeal from the United States District Court for the District of Minnesota.

Submitted: February 16, 1996

Filed: July 12, 1996

Before McMILLIAN, LAY, and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Michael Wayne, also known as Michael Wayne Fenney, appeals from the district court's[1] denial of his petition for a writ of habeas corpus brought under 28 U.S.C. § 2254 (1994). Wayne is serving a term of life imprisonment following his convictions for murder in Minnesota state court. Wayne argues that he did not receive a fair trial because the State failed to disclose two pieces of evidence favorable to him. In addition, Wayne makes seven other arguments in a pro se brief. We affirm the judgment of the district court.

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Mona Armendariz was murdered during the early morning of July 29, 1986 in her trailer home in the Janesville Trailer Court of Janesville, Minnesota. She was stabbed thirteen times and her throat was cut. The State charged Wayne with the murder and his defense at trial was that someone else, possibly Steven Sack, committed the murder. Wayne was found guilty and was sentenced to life in prison.

Some three and a half years after Wayne's trial, Carolann Eggert gave a statement to an investigator that Steven Sack came to her home in Janesville with Wade Abraham at two o'clock in the morning on July 29, 1986. Eggert said Abraham "pound[ed] through [her] front door and went directly to [her] son William's bedroom door and pounded on it." When Eggert confronted Abraham about coming into her home at two o'clock in the morning, Abraham stated that "something terrible has happened." Eggert's son William got up and spoke to Abraham outside of Eggert's hearing. At this time Eggert saw Sack standing in her home, with blood on his shirt, pants, and hands, holding a bloody butcher knife. She stated that the knife was eight to ten inches long and about one and a half inches wide. Abraham and Sack wanted to use Eggert's washing machine to wash Sack's bloody clothes. Sack went into Eggert's kitchen and washed the blood off of the knife in her kitchen sink. Finally, Abraham and Sack left after Eggert angrily confronted them and told them to go to Abraham's aunt's house. Eggert stated that this visit upset all of her children and that she talked to her sons Scott, William, and Mark to settle them down.

There is considerable dispute over when Eggert first told someone else about Abraham and Sack's visit to her house. Eggert claims that she told Sheriff Edward Kubat her story when he came to serve a subpoena on her son before Wayne's trial. Kubat denies that Eggert ever told him anything about Sack being at her home with a knife and blood on his clothes. Eggert also claims that before Wayne's trial she told a Janesville city police officer

about Sack's visit, but she cannot remember the police officer's name. Wayne has produced no evidence as to the identity of the police officer. Other than Sheriff Kubat and the city police officer, Eggert does not claim to have told her story to anyone else before or during Wayne's trial.

After his trial, Wayne also discovered that the Janesville police had found a knife on the roof of Ann Armendariz's trailer home. Ann Armendariz is the sister-in-law of the murder victim and a resident of the Janesville Trailer Court. On September 3, 1986, approximately five weeks after Mona Armendariz's murder, one of Ann's children found a knife on top of Ann's trailer home. Without disturbing the knife, Ann called the Janesville police who sent an officer out to get the knife. The officer took pictures of the knife and measured it before taking it back to the police department.

The police officer described the knife as a common paring knife which could be found in any kitchen. He also stated that there was nothing about the knife that would indicate its owner, where it came from, or how long it had been on Ann Armendariz's roof. The officer observed no blood on the knife, nor any rust or dirt, even though it was exposed to the weather on the roof. The knife's blade was two and thirteen-sixteenths inches long.

Wayne filed a petition for post-conviction relief in Minnesota state court based on newly discovered evidence including Eggert's statement. The trial court denied Wayne's petition and he appealed. The Minnesota Supreme Court affirmed the trial court's denial of Wayne's petition. Wayne v. State, 498 N.W.2d 446 (Minn. 1993).

In affirming the denial of Wayne's petition for post-conviction relief, the Minnesota Supreme Court referred to the questionable nature of the Eggert testimony, analyzing its

credibility in detail, and stated that Eggert's statement was doubtful. Id. at 448. First, the court stated that Eggert's story conflicted with those of her sons. Eggert's sons William and Mark both testified that while Abraham and Sack visited their home the night of the murder, their mother was asleep during the visit. Id. The sons never mentioned any blood on Sack in their testimony. Id. Second, the court stated that Eggert's story was less credible because she failed to come forward with it earlier. Id. The court pointed out that Eggert did not reveal her story about Sack, even though she kept up with Wayne's trial. Id. Finally, even assuming Eggert's story to be true, the court stated that it was highly unlikely that the eight-inch-long butcher knife, which Eggert saw in Sack's possession, was the murder weapon. Id. At Wayne's trial, a forensic pathologist testified that the murder weapon probably had a blade about one and a half inches long and one-half inch wide. Id. In light of these contradictions, the Minnesota Supreme Court concluded that "Eggert's testimony would almost certainly not change the verdict" of Wayne's trial, and that "the trial court did not abuse its discretion in deciding that [her testimony] would not produce a different and more favorable result at a new trial." Id.

After his unsuccessful appeal to the Minnesota Supreme Court, Wayne filed this petition for a writ of habeas corpus in the district court. His petition was referred to a magistrate judge[2] who prepared a report and recommendation. The magistrate judge found that Eggert never told her story to Sheriff Kubat, a Janesville police officer, or anyone else connected with the State before the end of Wayne's trial. The judge concluded that even if Eggert's statement had been presented at Wayne's trial, there was no reasonable probability that there would have been a different result. The judge stated that the credibility of Eggert's

[2]The Honorable Floyd E. Boline, United States Magistrate Judge for the District of Minnesota.

statement was diminished by the passage of time, her history of mental illness, and the obvious inconsistencies between her story and the other evidence in the case. Finally, the judge concluded that there was nothing about the paring knife which would have helped prove Wayne's guilt or innocence and, therefore, its disclosure would not have changed the result of Wayne's trial. The magistrate judge recommended that the district court deny Wayne's petition. The district court adopted the magistrate judge's report and recommendation, and Wayne appeals.

## I.

Wayne argues that the State violated his right to due process by failing to disclose Eggert's statement to him before his trial. He asserts that the State knew about Eggert's statement before his trial and that the statement would have helped him prove his innocence at trial.

Under the Due Process Clause of the Fourteenth Amendment, the State has a duty to disclose evidence which is favorable to Wayne and material to the issue of his guilt. Brady v. Maryland, 373 U.S. 83, 87 (1963). To prove a violation of this duty, Wayne must show that: (1) the State suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the issue of his guilt. United States v. Thomas, 940 F.2d 391, 392 (8th Cir. 1991). Favorable evidence is material to the issue of Wayne's guilt if there is a reasonable probability that, had the evidence been disclosed to him, the result of his trial would have been different. Kyles v. Whitley, 115 S. Ct. 1555, 1565 (1995) (quoting United States v. Bagley, 473 U.S. 667 (1985)). There is a reasonable probability of a different result if the State's suppression of the favorable evidence undermines our confidence in the outcome of Wayne's trial. Id. at 1566.

**A.**

The State argues that it did not violate its duty to disclose Eggert's statement because it did not know about her statement until after Wayne's trial. The district court adopted the magistrate judge's factual finding that the State did not know about Eggert's statement until after Wayne's trial. We must accept this factual finding unless it is clearly erroneous. Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

Eggert claims that she told her story about Sack to Sheriff Kubat and an unnamed Janesville police officer before Wayne's trial. Sheriff Kubat denies that Eggert told him anything relating to Mona Armendariz's murder. Eggert has also failed to identify the Janesville police officer she told her story to, and Wayne has produced no evidence as to the identity of the police officer. Eggert has never claimed to have told her story to anyone else connected with the State before Wayne's trial. On this evidence, the district court's factual finding that the State was not aware of Eggert's statement before the end of Wayne's trial is not clearly erroneous. Therefore, the State did not violate its duty to disclose Eggert's statement.

In addition to the district court's factual finding, the state trial court also concluded that Eggert lacked credibility with respect to her assertion that she told Sheriff Kubat and a Janesville police officer about Sack's visit before Wayne's trial. We must give state court factual findings a presumption of correctness on federal habeas review. 28 U.S.C. § 2254(d) (1994); Prewitt v. Goeke, 978 F.2d 1073, 1076 (8th Cir. 1992). The district court could well have rested its analysis on the state court's finding, as Wayne has established none of the circumstances enumerated in section 2254(d) that overcome the presumption of correctness, nor has he produced convincing evidence that the state

court's factual determination was erroneous. 28 U.S.C. § 2254(d).

**B.**

Even assuming that the State knew of Eggert's statement before Wayne's trial, failure to disclose her statement does not undermine our confidence in the outcome of Wayne's trial. Eggert's statement is substantially contradicted by evidence presented at Wayne's trial or available at the time of his trial.

Eggert's son Mark testified at the grand jury hearing conducted before Wayne's trial. Mark, who lived with his mother, testified that Sack arrived at their house alone just after midnight in the early morning of July 29, 1986, and that Sack stayed and watched television with him until five o'clock in the morning. Mark further testified that Abraham came to the house about a half-hour to an hour after Sack and that Abraham stayed and slept in the house until at least five o'clock when Mark went to bed. When asked about his mother, Mark stated that she went to bed around nine o'clock and was asleep when Abraham and Sack came to the house. Mark never mentioned any blood on Sack or that Sack was holding a butcher knife.

Eggert's son Scott also testified before the grand jury. Scott stated that he went to bed around 11:30 P.M. on July 28, 1986, and that he never saw Sack at the house.

Eggert's son William testified at the grand jury hearing and at Wayne's trial. At the grand jury hearing William testified that he spoke for ten minutes with Abraham sometime late during the night of July 28, 1986. He stated that Abraham spoke for five minutes with Sack, after which William went back to his bedroom. William did not mention seeing his mother awake when he saw Abraham and Sack at their house, nor did he mention a knife or any blood on Sack.

At Wayne's trial, William testified that sometime during the early morning of July 29, 1986 Abraham came over to his house to talk to him and that Sack arrived at his house sometime after Abraham. William testified that Sack appeared "pitch white" and "really scared," and that Sack began to sharpen a knife. William stated that Sack wanted to wash his clothes because Sack said that there was "mud on them or something." Finally, William testified that Abraham and Sack slept overnight at his house and that Abraham left at seven or eight o'clock in the morning, while Sack left at five or six in the morning.[3]

The grand jury testimony of Eggert's three sons substantially contradicts her testimony. Mark told the grand jury that his mother was asleep when Abraham and Sack visited their house in the early morning of July 29, 1986. William never mentioned his mother when he described Abraham and Sack's visit, even when he was asked specifically about his mother. None of Eggert's sons mentioned Sack being covered in blood or possessing a knife. Eggert testified that the commotion surrounding Sack's bloody visit woke up everyone in the house. However, her son Scott testified that he went to bed at 11:30 P.M. on July 28, 1986 and that he never saw Sack at the house. While Eggert testified that she told Abraham and Sack to leave and that they did as she asked, Mark told the grand jury that Sack sat up and watched television with him until five o'clock in the morning and that Abraham slept at the house until at least five o'clock in the morning. Eggert's testimony about her angry confrontation with Abraham and Sack is flatly contradicted by the grand jury testimony of her three sons.

---

[3]Wayne called William to testify at his trial. The prosecutor thoroughly cross-examined William over the differences between his testimony before the grand jury and at Wayne's trial. William could not explain the differences and admitted at the trial that he was having "a lot of difficulty with his memory" and that his memory was probably better earlier than it was at trial.

William's trial testimony also largely contradicts Eggert's testimony. While William did testify that Sack had a knife and that he wanted to wash his clothes, William never mentioned the presence of his mother, much less an angry confrontation between his mother and Sack and Abraham, or blood on Sack's clothes.

In addition to the contradictory testimony of Eggert's three sons, the trial testimony of Doctor Lindsey Thomas also contradicts Eggert's story. Dr. Thomas, a forensic pathologist, conducted the autopsy of Mona Armendariz. Dr. Thomas testified that the stab wounds on Mona Armendariz's body were consistently about one-half inch in width and one and a half inches in depth and that a knife with a blade approximately one and a half inches long and one-half inch wide probably made all of the stab wounds. Dr. Thomas testified that a larger knife could have produced the stab wounds, but that it was unlikely that someone could make so many wounds that are consistently the same depth with a larger knife. Thus, even if Eggert saw Sack with a bloody butcher knife with a blade eight to ten inches long and one and a half inches wide, Dr. Thomas testified that it was unlikely that such a large knife could have been the one used to kill Mona Armendariz. In light of all of this contrary testimony, we conclude that Eggert's testimony, even if suppressed, does not undermine our confidence in the outcome of Wayne's trial.

## II.

Wayne argues that the State should have disclosed to him its discovery of the knife found on top of Ann Armendariz's trailer home. There is no evidence, however, which connects the knife to Mona Armendariz's murder. First, the knife was discovered approximately five weeks after the murder, and there was no indication how long it had been on the roof. Second, there was nothing about the knife indicating where it came from or who owned it. Third, while there was no evidence linking the knife to any

murder, there was evidence that it could not have been the knife used in Mona Armendariz's murder. Dr. Thomas testified that it was unlikely that a knife with a blade longer than an inch and a half was used to murder Mona Armendariz. The knife's blade was almost three inches long, making it unlikely that it was the murder weapon. The State's failure to disclose its discovery of this knife does not undermine our confidence in the outcome of Wayne's trial.[4]

## III.

Wayne also submitted a pro se brief along with the brief submitted by his appointed counsel in his appeal to this court. This court granted leave to file this brief, although generally we do not consider pro se briefs when a party is represented by counsel. Hoggard v. Purkett, 29 F.3d 469, 472 (8th Cir. 1994). We have considered the arguments in Wayne's pro se brief and they are without merit.

Accordingly, we affirm the judgment of the district court denying Wayne's petition for a writ of habeas corpus.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]Kyles requires us to consider collectively all of the evidence that the State failed to disclose to Wayne when we determine whether the undisclosed evidence undermines our confidence in the outcome of Wayne's trial. 115 S. Ct. at 1567. While the district court found that the State did not know about Eggert's statement before Wayne's trial, and that finding is not clearly erroneous, we hold that the State's failure to disclose both Eggert's statement and the knife does not undermine our confidence in the outcome of Wayne's trial.