# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3579

_____

| | | |
|---|---|---|
| Lewis E. Ashker, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Joseph Class, Warden, South | * | of South Dakota. |
| Dakota Penitentiary, and Mark W. | * | |
| Barnett, Attorney General of South | * | |
| Dakota, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  May 14, 1998

Filed:  August 14, 1998

_____

Before McMILLIAN, NOONAN,[1] and MORRIS SHEPPARD ARNOLD, Circuit
        Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

A state court jury in South Dakota convicted Lewis Ashker of a murder that the
prosecutor contended took place on June 13, 1985.  The South Dakota Supreme Court

_____

[1]The Honorable John T. Noonan, Jr., United States Circuit Judge for the Court
of Appeals for the Ninth Circuit, sitting by designation.

affirmed Mr. Ashker's conviction on direct appeal, see State v. Ashker, 412 N.W.2d 97 (S.D. 1987), and also affirmed the denial of his petition for a state writ of habeas corpus, see Ashker v. Solem, 457 N.W.2d 473 (S.D. 1990).

Mr. Ashker then petitioned for a federal writ of habeas corpus under 28 U.S.C. § 2254. He asserted five grounds for relief: (1) the prosecutor's failure to disclose exculpatory evidence; (2) the state trial court's error in allowing the prosecutor to introduce alleged impeachment evidence in violation of the confrontation clause; (3) prosecutorial misconduct, including the two actions described above, the display of three knives irrelevant to the case, the eliciting from a witness of a reference to the possibility that Mr. Ashker had a prior criminal record, and the failure to ensure that one of the state's witnesses was sequestered during jury selection and while other witnesses were testifying; (4) constitutionally insufficient evidence; and (5) ineffective assistance of counsel, specifically, the failure to interview, and/or to obtain for trial, several potential witnesses, and the failure to obtain an expert witness for trial.

The district court granted Mr. Ashker's petition, holding that it was a violation of the confrontation clause to allow the prosecutor to introduce alleged impeachment evidence that suggested that Kurt Novaock,[2] Mr. Ashker's companion on June 13, came home on the following day with bloody clothes, which Mr. Novaock's wife subsequently destroyed (the district court's opinion is not entirely clear about whether the district court also considered the introduction of that evidence to be prosecutorial misconduct). See Ashker v. Leapley, 798 F. Supp. 590 (D. S.D. 1992). Because of

---

[2]Mr. Novaock and Mr. Ashker were tried separately, and a state court jury also convicted Mr. Novaock. The South Dakota Supreme Court affirmed that conviction on direct appeal, see State v. Novaock, 414 N.W.2d 299 (S.D. 1987), and also affirmed the denial of his petition for a state writ of habeas corpus, see In re Application of Novaock, 572 N.W.2d 840 (S.D. 1998).

its resolution of the confrontation clause issue, the district court did not decide the merits of the other issues that Mr. Ashker asserted in his petition.

On the state's appeal of the district court's order, we reversed, holding that Mr. Ashker had never raised the confrontation clause issue in the state courts (as either trial-court error or prosecutorial misconduct), and therefore that he had failed to exhaust that issue in the state courts before presenting it to a federal court. We held in addition that, because Mr. Ashker could file another petition for a state writ of habeas corpus if he could show reasonable cause under state law for previously failing to assert claims based on the confrontation clause, a non-futile state court remedy still existed that he had to pursue. See Ashker v. Leapley, 5 F.3d 1178 (8th Cir. 1993); see also 28 U.S.C. § 2254(c). We did not consider the merits of the other issues that Mr. Ashker asserted in his petition.

Mr. Ashker subsequently petitioned again for a state writ of habeas corpus, presenting claims based on the confrontation clause. The South Dakota Supreme Court affirmed the denial of that petition, see Ashker v. Class, 534 N.W.2d 66 (S.D. 1995), holding that Mr. Ashker had failed to show reasonable cause under state law for previously failing to assert those claims.

Mr. Ashker then petitioned again for a federal writ of habeas corpus under 28 U.S.C. § 2254, asserting the same five grounds for relief that were contained in his original petition to the district court. He contended as well that he received ineffective assistance of counsel because of his trial counsel's failure to assert, on direct appeal, claims related to the confrontation clause.

With respect to Mr. Ashker's claims of a violation of the confrontation clause, the district court held that Mr. Ashker had failed to show reasonable cause under federal law for his previous failure to assert those claims in the state courts, that he had therefore defaulted on those claims in the state courts, and thus that he was

-3-

procedurally barred from bringing them in a federal court. The district court also considered the merits of Mr. Ashker's other claims but rejected them. Mr. Ashker appeals, and we affirm the judgment of the district court.

I.

Mr. Ashker alleges that his due process rights were violated by the prosecutor's failure to disclose exculpatory evidence. See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Kyles v. Whitley, 514 U.S. 419, 421, 434-35, 437, 453 (1995); United States v. Bagley, 473 U.S. 667, 678 (1985); and United States v. Agurs, 427 U.S. 97, 104, 108, 111 (1976). That evidence was a sketch showing that tire tracks in the victim's yard measured 71 inches from center to center. The sketch was exculpatory, according to Mr. Ashker, because the tire tracks of Mr. Ashker's truck measured approximately 64 inches center to center. Mr. Ashker argues that the sketch therefore tended to suggest, contrary to the state's theory, that it was not Mr. Ashker's truck that had been in the victim's yard.

As the district court noted, however, the South Dakota Supreme Court adopted the state habeas court's factual findings, first, that the prosecutor learned of the sketch during Mr. Ashker's state trial; second, that as soon as the prosecutor became aware of the sketch, he disclosed its contents to Mr. Ashker; and, third, that the prosecutor also introduced the information from the sketch (although not the sketch itself) into evidence at the state trial. See Ashker v. Solem, 457 N.W.2d at 478. Mr. Ashker's citations of testimony from various witnesses at his state trial and at a hearing on his first petition for a state writ of habeas corpus (the transcripts from both of which we have read) do not, in our view, provide the "clear and convincing" evidence necessary to overcome the presumption of correctness that the law assigns to those findings. See 28 U.S.C. § 2254(e)(1); see also 28 U.S.C. § 2254(d)(2) and Smith v. Jones, 923 F.2d 588, 590 (8th Cir. 1991). We therefore reject Mr. Ashker's allegation that the prosecutor failed to disclose exculpatory evidence.

Mr. Ashker suggests in the alternative that even if the prosecutor did disclose the sketch during the state trial, that disclosure came "too late to apprehend its significance and [to] use the evidence." He argues, therefore, that his due process rights were still violated. See, e.g., United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985); United States v. Flaherty, 668 F.2d 566, 588-89 (1st Cir. 1981); and United States v. Elmore, 423 F.2d 775, 779 (4th Cir. 1970), cert. denied, 400 U.S. 825 (1970). "In determining whether disclosure was timely enough to satisfy due process, we consider the prosecution's reasons for late disclosure, ... and [what opportunity] ... the defendant had ... to make use of the disclosed material." LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987).

Mr. Ashker apparently does not contend that he was unaware of the tire tracks themselves in the victim's yard. Indeed, Mr. Ashker himself testified during the hearing on his first petition for a state writ of habeas corpus that before trial he had seen at least one photograph of the tire tracks in the victim's yard. Mr. Ashker's trial counsel testified at that hearing as well and stated that before trial he had seen "all kinds of photographs," including at least one that showed "faint ... tracks" in the victim's yard. In addition, at least one police report that presumably was given to Mr. Ashker (and he does not allege to the contrary) specifically mentions "faint vehicle tracks" in the victim's yard. We note as well that Mr. Ashker made no objection to the portions of the state trial testimony by three law enforcement officers that established the existence of the tire tracks in the victim's yard. Nor, while cross-examining those witnesses, did Mr. Ashker ask any questions at all that would suggest that before that testimony, he was unaware of the existence of the tire tracks in the victim's yard.

Mr. Ashker's emphasis, rather, is evidently on the fact that he did not know before trial either that law enforcement officers had measured the width of the tire tracks in the victim's yard or that a discrepancy existed between the 71-inch measurement of those tracks and the approximately 64-inch measurement of the tire tracks from Mr. Ashker's truck. It does not seem unreasonable, we observe initially,

to suggest that Mr. Ashker's knowledge of the tire tracks themselves in the victim's yard could, or even should, have prompted him to determine whether those tracks could be definitively linked to his truck. If he had done so, he could have learned of the discrepancy himself. Under S.D. R. Crim. P. 23A-13-13, which is identical to Fed. R. Crim. P. 16(b)(1)(B), and S.D. R. Crim. P. 23A-13-14, which is identical to Fed. R. Crim. P. 16(b)(2), moreover, the fact that Mr. Ashker had made such measurements would not have been discoverable by the state if the measurements were not committed to written form and if the measurements were not obtained by a hired private investigator (a pretrial order in this case required a written report to the state from any private investigator hired by Mr. Ashker). See, e.g., United States v. Peters, 937 F.2d 1422, 1425 (9th Cir. 1991) (on the equivalent federal rule; we have found no South Dakota cases on point); see also State v. Westerfield, 567 N.W.2d 863, 868-69 (S.D. 1997) (using federal cases for "guidance" on interpretation of South Dakota discovery rules that are identical to federal discovery rules). Nonetheless, we turn to a consideration of the effect of the measurements in question.

We do not see anything exculpatory in an individual measurement, by itself, of the tire tracks from either the victim's yard or Mr. Ashker's truck. Standing alone, either individual measurement -- or even the fact that either individual measurement was made -- is therefore outside the scope of disclosures that Brady, 373 U.S. at 87, requires. See, e.g., Moore v. Illinois, 408 U.S. 786, 794-95 (1972). See also United States v. Thomas, 543 F.2d 1226, 1228 n.4 (8th Cir. 1976) (per curiam), cert. denied, 429 U.S. 1051 (1977); Williams v. Wolff, 473 F.2d 1049, 1054 (8th Cir. 1973) (per curiam); and 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 557.2 at 355 (1982).

It is only when we consider the measurement of the tire tracks from the victim's yard in combination with the measurement of the tire tracks from Mr. Ashker's truck that the possibility even arises that collectively the evidence in question might be exculpatory. We look then to the question of when the prosecutor learned about either

of the measurements and when the prosecutor accordingly could reasonably have been expected to anticipate that if the law enforcement officers had made the other measurement, the collective effect of those measurements might be exculpatory. See, e.g., Wayne v. Benson, 89 F.3d 530, 533-34 (8th Cir. 1996), cert. denied, 117 S. Ct. 776 (1997) (prosecutor did not know of alleged statement to sheriff by witness), and Fairchild v. Lockhart, 979 F.2d 636, 640, 640 n.8 (8th Cir. 1992), cert. denied, 509 U.S. 928 (1993) (nothing in prosecutor's file would alert prosecutor to existence of evidence in question, although sheriff had it); see also United States v. Turner, 104 F.3d 217, 220 (8th Cir. 1997) (prosecutor was not "aware of" evidence in question), and United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996) (prosecutor has to have "known" of evidence in question for Brady violation to occur). We note, incidentally, the logic of expecting that Mr. Ashker would "apprehend [the] significance" of the evidence in question at the same point that he expects the prosecutor to have done so.

After jury selection, Mr. Ashker's trial lasted for slightly more than four days. On the second of those days, a law enforcement officer testified that he had made measurements of the tire tracks in the victim's yard. Given the presumed correctness of the state habeas court's finding, adopted by the South Dakota Supreme Court, see Ashker v. Solem, 457 N.W.2d at 478, that the prosecutor first learned of the measurements in question during the state trial, see 28 U.S.C. § 2254(e)(1), the law enforcement officer's testimony is the first occasion, in our view, that the prosecutor could even have realized that evidence previously unknown to him existed that, in combination with other evidence that might exist, could be potentially exculpatory in nature.

The prosecutor's "reasons for late disclosure" to Mr. Ashker, LaMere, 827 F.2d at 625, thus seem quite defensible and eminently rational to us. We note, moreover, that although Mr. Ashker might have been entitled to a continuance of his state trial at the point when the testimony revealed the existence of measurements from the tire

tracks in the victim's yard, see, e.g., United States v. Krohn, 558 F.2d 390, 394 (8th Cir. 1977), cert. denied, 434 U.S. 868 (1977), Mr. Ashker never asked for a continuance on that basis. Given that fact and the fact that Mr. Ashker had at minimum more than an additional day "to digest the evidence and to prepare [additional] cross-examination[]," United States v. Flaherty, 668 F.2d at 591, we decline to hold that the prosecutor's delay in disclosing the evidence in question deprived Mr. Ashker of due process. See, e.g., United States v. Elmore, 423 F.2d at 779. See also LaMere, 827 F.2d at 625; United States v. Rosales, 680 F.2d 1304, 1350 (10th Cir. 1981); and McClendon v. United States, 587 F.2d 384, 389 (8th Cir. 1978), cert. denied, 440 U.S. 983 (1979).

## II.

Federal review of Mr. Ashker's confrontation clause claims is procedurally barred unless Mr. Ashker can show "cause for the default [in the state courts] and actual prejudice as a result of the ... violation" of the confrontation clause. Satter v. Leapley, 977 F.2d 1259, 1262-63 (8th Cir. 1992); see also Abdullah v. Groose, 75 F.3d 408, 411-13 (8th Cir. 1996) (en banc), cert. denied, 517 U.S. 1215 (1996).

Mr. Ashker offers four reasons why he feels that he has shown cause for his default in the state courts on the confrontation clause claims: (1) his trial counsel's intention to present, and good-faith belief that he did present, those claims through "the factual context" and the citations of authority included in Mr. Ashker's direct-appeal brief; (2) his trial counsel's ineffective assistance on Mr. Ashker's direct appeal, namely, the failure to present adequately the claims based on the confrontation clause; (3) his state habeas counsel's conclusion that the South Dakota Supreme Court's direct-appeal discussion of the alleged impeachment evidence in relation to state hearsay rules, see State v. Ashker, 412 N.W.2d at 99-103, presaged a lack of sympathy for an analogous argument based on the confrontation clause; and (4) the absence of any indication that Mr. Ashker's trial counsel or his state habeas counsel deliberately avoided presenting the confrontation clause claims in the state courts in the hope that

a federal court would be more receptive to them. The district court held that none of these reasons, singly or in combination, amounted to cause sufficient to excuse Mr. Ashker's default.

We have already held that "the factual context" and the citations of authority included in Mr. Ashker's direct-appeal brief were insufficient as a matter of law to present the confrontation clause claims. See Ashker v. Leapley, 5 F.3d at 1179-80. If the intentions and beliefs of Mr. Ashker's trial counsel (who prepared the direct-appeal brief) were relevant, however, we hold that they do not amount to sufficient cause to overcome the procedural bar in question here. See, e.g., Murray v. Carrier, 477 U.S. 478, 492 (1986); see also McCleskey v. Zant, 499 U.S. 467, 506, 510 (1991) (Marshall, J., dissenting) (under the test for cause, "the state of mind of counsel is largely irrelevant").

Mr. Ashker's assertion of his trial counsel's ineffective assistance on direct appeal, moreover, is not cognizable at this point, because Mr. Ashker did not make that particular ineffective assistance claim in his first petition for a state writ of habeas corpus, see Ashker v. Class, 534 N.W.2d at 69, see also Ashker v. Solem, 457 N.W.2d at 475-77, or, for that matter, in his first petition for a federal writ of habeas corpus. Nor do we see any explanation for that default in any of the relevant hearings or in Mr. Ashker's briefs to the district court or to this court. In these circumstances, we decline to consider Mr. Ashker's allegations with respect to his trial counsel's ineffective assistance in failing to assert confrontation clause claims on direct appeal. See, e.g., Wyldes v. Hundley, 69 F.3d 247, 253 (8th Cir. 1995), cert. denied, 517 U.S. 1172 (1996); see also Charron v. Gammon, 69 F.3d 851, 857-59 (8th Cir. 1995), cert. denied, 518 U.S. 1009 (1996).

In a hearing on Mr. Ashker's second petition for a state writ of habeas corpus, his state habeas counsel testified that although the South Dakota Supreme Court did not "directly" address any confrontation clause issues in its opinion on Mr. Ashker's direct

appeal, "the language of the opinion" "forecast" "the outcome of raising" such questions, namely, that the South Dakota Supreme Court "would make short shrift" of such questions and therefore that "they had no chance of success." Mr. Ashker's state habeas counsel further testified that he feared that raising such questions in Mr. Ashker's petition for a state writ of habeas corpus would be "futile" and would do "nothing but incur the wrath of the justices."

We do not understand why Mr. Ashker attaches significance to the rationale behind his state habeas counsel's decision not to raise confrontation clause claims in the South Dakota Supreme Court. The only relevance of that rationale that we can discern might be in connection with a claim of ineffective assistance on the part of Mr. Ashker's state habeas counsel. Such a claim would fail as a matter of law, however, because it is well settled that there is no constitutional right to effective assistance of counsel in state habeas proceedings. See, e.g., Coleman v. Thompson, 501 U.S. 722, 752, 755, 757 (1991). We therefore reject Mr. Ashker's contention that his state habeas counsel's actions provide sufficient cause for Mr. Ashker's default in the state courts on the confrontation clause claims.

Finally, Mr. Ashker cites two cases in support of his contention that the absence of an intent to bypass the state courts (in the hope of a more sympathetic reception in a federal court) provides cause sufficient to overcome a procedural bar. Neither is factually analogous to Mr. Ashker's circumstances.

In Amadeo v. Zant, 486 U.S. 214 (1988), a criminal defendant defaulted at his state trial on an equal protection challenge to his grand jury and his trial jury, see id. at 216-17, but did so only because he was unaware that the state was at that time intentionally discriminating by race in the selection of all prospective jurors, see id. at 218, 220, 225. When the defendant discovered after trial (by "mere fortuity," id. at 224) the state's deliberate concealment of its intentional underrepresentation of black

-10-

people on its jury lists, the defendant asserted an equal protection challenge on direct appeal, id. at 218.

In Reed v. Ross, 468 U.S. 1, 3, 7 (1984), a murder defendant defaulted in his state direct appeal on a due process challenge to the allocation of the burden of proof for malice. Six years later, the Supreme Court decided that the allocation in question was unconstitutional. See id. at 3-4. Two years after that, the Supreme Court held that the rule established in its earlier decision applied retroactively. See id. at 3-5. Shortly after the Supreme Court's decision on retroactivity, the defendant petitioned, on the basis of the two Supreme Court cases, for postconviction relief in the state courts, see id. at 7, and subsequently for a federal writ of habeas corpus, see id. at 7-8.

The Supreme Court held in both Amadeo, 486 U.S. at 221, 223, 228-29, and Reed, 468 U.S. at 9, 14-20, that the defendant did not deliberately bypass the state courts on the defaulted issue, that other considerations were also present, and therefore that the defendant had established sufficient cause to overcome the procedural bar. The import of those cases, however, is not that the absence of an intent to bypass the state courts excuses a procedural bar, as Mr. Ashker apparently contends.

The relevant lesson of those cases is rather that when later-discovered (and previously undiscoverable) facts or later-adopted (and previously rejected) rules of constitutional law give rise to a claim cognizable in habeas corpus proceedings, a federal court is not precluded from considering an issue that the defendant defaulted in the state courts, as long as no evidence suggests that the defendant deliberately defaulted that issue in the state courts. There are no such facts and no such rules of constitutional law at issue in Mr. Ashker's case. We therefore reject Mr. Ashker's final contention with respect to whether he has shown cause adequate to excuse his default on the confrontation clause claims.

-11-

Since Mr. Ashker has not shown adequate cause to overcome the procedural bar in his case, moreover, we need not consider the issue of actual prejudice. See, e.g., Engle, 456 U.S. at 134 n.43; see also Zeitvogel v. Delo, 84 F.3d 276, 279 (8th Cir. 1996), cert. denied, 117 S. Ct. 368 (1996).

## III.

Mr. Ashker asserts that the prosecutor in the state trial committed misconduct sufficiently serious to amount to a denial of due process. See, e.g., Donnelly v. DeChristoforo, 416 U.S. 637, 642-43, 645, 647-48, 648 n.23 (1974); see also Wycoff v. Nix, 869 F.2d 1111, 1113-14 (8th Cir. 1989), cert. denied, 493 U.S. 863 (1989). Specifically, Mr. Ashker alleges (1) the failure to disclose exculpatory evidence, (2) the introduction of alleged impeachment evidence in violation of the confrontation clause, (3) the display of three knives irrelevant to the case, (4) the eliciting from a witness of a reference to the possibility that Mr. Ashker had a prior criminal record, and (5) the failure to ensure that one of the state's witnesses was sequestered during jury selection and while other witnesses were testifying. For the reasons already discussed above, we reject Mr. Ashker's argument on the first allegation, and he is procedurally barred from pursuing the second one.

We turn to the remaining three allegations. Our task with respect to them is to determine whether the prosecutor's actions " 'were so egregious that [they] fatally infected the entire trial, rendering it fundamentally unfair.' " Wycoff, 869 F.2d at 1113, quoting Crespo v. Armontrout, 818 F.2d 684, 687 (8th Cir. 1987), cert. denied, 484 U.S. 978 (1987); see also Donnelly, 416 U.S. at 643, 645.

During the state trial, the prosecutor questioned various witnesses about, and displayed, a "hunting knife" that was found on the victim's kitchen table, a "buck knife" that was found in Mr. Ashker's bedroom, and a "butchering knife" with "a curved blade" that was found in a ditch along a highway between the towns in which the victim and Mr. Ashker lived. The prosecutor offered no evidence that connected any of the

-12-

knives with the murder. Mr. Ashker contends that the prosecutor's actions "compromised his due process rights."

We note that on Mr. Ashker's motion, the trial court admonished the jury that none of the knives was "the murder weapon," that none of the knives had "any probative value whatsoever in this case," and that the jurors were "to disregard having seen or ... heard any testimony" about the knives and to "put [that information] out of [their] minds." In light of the contents of that admonition, the lack of blood or fingerprint evidence derived from any of the knives, and the "crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions," Francis v. Franklin, 471 U.S. 307, 325 n.9 (1985), see also United States v. Olano, 507 U.S. 725, 740 (1993), we agree with the district court that Mr. Ashker's case is not one where "the risk of prejudice ... [was] so great that even a limiting instruction [would] not protect [the] criminal defendant's constitutional rights," Francis, 471 U.S. at 324-25 n.9. We therefore reject Mr. Ashker's allegation of a violation of his due process rights with respect to the prosecutor's display of the three knives.

IV.

A television reporter testified at Mr. Ashker's state trial about an interview that Mr. Ashker had granted to her a week after he was charged with the murder. The prosecutor asked what questions the reporter posed to Mr. Ashker and what his responses were. When the prosecutor asked the reporter if there was "anything else [she] remember[ed] about the interview," she answered, "I asked him if he had been convicted before." At that point, Mr. Ashker objected before the reporter could say anything further. After a bench conference, the reporter continued testifying but said nothing more about the question of Mr. Ashker's prior criminal record. Mr. Ashker asserts that through the reporter's initial answer, and in violation of a pretrial order, the prosecutor "managed to improperly alert the jury" to the possibility that Mr. Ashker had a prior criminal record and thus undermined his due process rights.

-13-

We note that the reporter never actually stated whether Mr. Ashker had a prior criminal record and that the prosecutor never even alluded to that possibility in subsequent questioning. We also note that Mr. Ashker's trial counsel specifically declined the option of an immediate jury instruction by the state trial court "mandating that the jury totally disregard [the] statement" by the reporter.

To the extent, moreover, that Mr. Ashker contends that the prosecutor's motive in questioning the reporter was somehow relevant (a proposition of which we are skeptical), we observe that the state trial court made factual findings, and the South Dakota Supreme Court agreed, see State v. Ashker, 412 N.W.2d at 103-04, that the reporter's statement "up to this point was unsolicited and unexpected" and that the prosecutor had "no way" of knowing that the reporter "had talked to the defendant about his prior convictions." We have read the transcript of the state trial and are satisfied that Mr. Ashker has not provided the "clear and convincing" evidence necessary to overcome the presumption of correctness that the law assigns to those findings. See 28 U.S.C. § 2254(e)(1); see also 28 U.S.C. § 2254(d)(2) and Smith, 923 F.2d at 590.

The prosecutor's question did not suggest that Mr. Ashker might in fact have a prior criminal record, the reporter never stated how Mr. Ashker answered her question, and there was no further mention of the topic during the remaining two and a half days of the state trial. In light of those facts, we do not believe that the effect of the incident was so egregiously prejudicial as to render Mr. Ashker's trial fundamentally unfair. We therefore reject Mr. Ashker's allegation of a violation of his due process rights with respect to the prosecutor's questioning of the reporter.

V.

At Mr. Ashker's state trial, the victim's daughter testified that she went to visit her father on the afternoon of June 13 but failed to find him at home. On cross-examination, Mr. Ashker's trial counsel asked if she had been in the courtroom during

-14-

jury selection (which took two and a half days and ended on the day that she testified), and she stated that she had been. Mr. Ashker subsequently moved for a mistrial based on the prosecutor's failure to sequester the witness. He argues that it was prosecutorial misconduct to fail to ensure that the victim's daughter was not in the courtroom at any time before her testimony.

We see no way in which the presence of the victim's daughter in the courtroom could have affected her testimony, since she testified only about her own actions and observations on June 13. To the extent, furthermore, that Mr. Ashker contends that the prosecutor deliberately failed to ensure that she was sequestered before testifying (about the relevance of which we are dubious), we note that the state trial court made a factual finding that the prosecutor's failure to ensure her sequestration was "inadver[t]ent." See also State v. Ashker, 412 N.W.2d at 104. In our view, Mr. Ashker has not provided the "clear and convincing" evidence necessary to overcome the presumption of correctness that the law assigns to that finding. See 28 U.S.C. § 2254(e)(1); see also 28 U.S.C. § 2254(d)(2) and Smith, 923 F.2d at 590.

Mr. Ashker has not even offered any speculation with respect to how the prosecutor's actions in regard to the victim's daughter could have compromised Mr. Ashker's state trial. Since we too are unable to suggest any theory relevant to that inquiry, we hold that those actions were not so prejudicial as to call into question the fundamental fairness of Mr. Ashker's state trial. We therefore reject his allegation of a violation of his due process rights occasioned by the prosecutor's failure to ensure the sequestration of the victim's daughter.

VI.

Mr. Ashker asserts that the evidence was insufficient as a matter of law to sustain his conviction. See, e.g., Jackson v. Virginia, 443 U.S. 307, 316, 319, 321, 324 (1979). In considering that assertion, we view the evidence in the light most favorable

-15-

to the state.  See, e.g., id. at 319, 326.  (We summarize the evidence from Mr. Ashker's state trial as viewed in that light.)

Mr. Novaock was a former neighbor of the victim for seven or eight months, had borrowed $300 from the victim at least once, and was on visiting terms with the victim when they lived adjacent to each other.  Mr. Ashker, who lived in Nebraska at the relevant time, and Mr. Novaock were together on the evening of June 13, 1985, in Mr. Ashker's 1978 green Chevrolet truck, which was licensed in Nebraska.  On June 13, neighbors of the victim saw Mr. Novaock and another man in an older-model green Chevrolet truck driving several times around the victim's block in South Dakota.  The truck, which had a Nebraska license plate, did not have its headlights on, even though darkness was falling.

One or two assailants attacked the victim in his home at some time later than 6:30 p.m. on June 13 and stabbed him repeatedly, possibly while robbing him of money and guns that were in the living room, where the victim's body was discovered.  The victim died sometime on June 13 or June 14.  Mr. Novaock came home very late on June 13 or very early on June 14.  Mr. Ashker came home very early on June 14.  When the victim's body was discovered, it was on top of a denim vest of the type that Mr. Novaock often wore.

In the week after the murder, law enforcement officers found a pen in the victim's yard with the logo of a bank that was located in the Nebraska town where Mr. Ashker lived.  The officers also found a clothesline pole in the victim's yard with paint chips at its base, two paint marks on it, and at least one dent in it.

Tests on the paint chips at the base of the pole and on the upper paint mark from the pole showed one layer of metallic green paint over a layer of gray primer plus certain solubility characteristics.  Tests on the body paint from Mr. Ashker's truck showed one layer of metallic green paint over a layer of gray primer.  Tests on paint

from a damaged portion of the tailgate area on Mr. Ashker's truck showed the same solubility characteristics as those from the paint chips at the base of the pole and those from the upper paint mark on the pole.

Tests on the paint chips at the base of the pole showed concave curvature. Tests on the paint from the damaged portion of the tailgate area on Mr. Ashker's truck showed concave curvature.

Tests on the lower paint mark from the pole showed one layer of white paint over some rust plus certain solubility characteristics. Tests on paint from the bumper area of Mr. Ashker's truck showed one layer of white paint over some rust plus solubility characteristics similar to those from the lower paint mark on the pole.

With respect to his whereabouts on the evening of June 13, moreover, Mr. Ashker said that he and Mr. Novaock were in Laurel, Nebraska, and were involved in a minor accident in front of a liquor store there. Neither the Laurel police nor the liquor store, however, had any record of such an accident.

Mr. Ashker also said that on the evening of June 13 he and Mr. Novaock subsequently went to Omaha, Nebraska, where they had an altercation with some other men in a restaurant parking lot. The Omaha police had a record of such an incident, but it had occurred very early in the morning of June 13, not during the evening.

We believe that, from the evidence above, which we summarize in the light most favorable to the state (i.e., without also describing evidence that conflicted with the evidence we cite), a rational trier of fact could find beyond a reasonable doubt that Mr. Ashker murdered the victim in this case, see id. at 319. We therefore reject his assertions with respect to the constitutional sufficiency of the evidence.

VII.

Finally, Mr. Ashker contends that his trial counsel was ineffective.  See, e.g., Strickland v. Washington, 466 U.S. 668, 686 (1984).  Specifically, Mr. Ashker refers to (1) his trial counsel's failure to interview, and/or to obtain for trial, several potential witnesses; (2) his trial counsel's failure to obtain an expert witness for trial; and (3) his trial counsel's failure to assert, on direct appeal, claims related to the confrontation clause.  We turn initially to Mr. Ashker's contention with respect to his trial counsel's failure to interview, and/or to obtain for trial, several potential witnesses.

The prosecutor argued at the state trial that the murder took place on June 13 (it is uncontested that Mr. Ashker had an alibi for June 14).  Mr. Ashker notes that one state trial witness testified with certainty that the victim was alive on June 14 and that two other state trial witnesses originally told law enforcement officers the same thing but became unsure at trial about whether June 14, rather than June 13, was the day when they saw the victim.

Mr. Ashker alleges that his trial counsel should have interviewed, and/or obtained for trial, four other potential witnesses, all of whom, according to Mr. Ashker, would have corroborated the testimony of the one state trial witness who said with certainty that the victim was alive on June 14 (there is some ambiguity in the earlier opinions and in the briefs with respect to names, and thus with respect to whether this allegation involves three or four potential witnesses; to give Mr. Ashker the most beneficial consideration, we assume that the correct number is four).  Such corroboration, Mr. Ashker states, would have overcome the effect of the testimony from the two state trial witnesses who were unsure at trial about which day they saw the victim.

After a hearing, the state habeas court made factual findings, and the South Dakota Supreme Court agreed, that none of the four potential witnesses would have testified with certainty that the victim was alive on June 14.  See Ashker v. Solem, 457

-18-

N.W.2d at 476-77, 477 n.2. After reading the transcripts of the grand jury proceedings, the state trial, and the hearing on Mr. Ashker's first petition for a state writ of habeas corpus, we are satisfied that Mr. Ashker has not provided the "clear and convincing" evidence necessary to overcome the presumption of correctness that the law assigns to those findings. See 28 U.S.C. § 2254(e)(1); see also 28 U.S.C. § 2254(d)(2) and Smith, 923 F.2d at 590.

Even if the four potential witnesses had testified as definitively as Mr. Ashker contends that they would have, moreover, their testimony would have been cumulative. At best, corroboration for the one witness who testified with certainty that the victim was alive on June 14 might have created some additional confusion about the date of the murder. In light of the significant nature of the paint evidence summarized above, however, in combination with the evidence that contradicted Mr. Ashker's accounts of his whereabouts on June 13, we believe that the effect of any additional confusion created by the putative testimony of the four witnesses in question would have been minimal -- and would have had less than the marginal effect required to establish a reasonable doubt with respect to Mr. Ashker's guilt. We therefore see no prejudice to Mr. Ashker, see Strickland, 466 U.S. at 687, from any failure by his trial counsel to interview, and/or to obtain for trial, those four potential witnesses.

The victim did some yard work for a fifth potential witness. The prosecutor argued at the state trial that when the victim was killed he was wearing the same clothes that he was wearing when he did the yard work; the prosecutor argued, accordingly, that the victim did that yard work on June 13. Mr. Ashker alleges that his trial counsel should have interviewed, and/or obtained for trial, that fifth potential witness, whose testimony, according to Mr. Ashker, would have proved that because she was home when the victim did the yard work but had "an established routine" that would have precluded her being home on most of June 13, the murder could not have taken place on that date. (At trial, Mr. Ashker argued, in contrast, that the victim did

-19-

the yard work on June 13 but that the murder did not occur until June 14. We make no comment on this apparent inconsistency in theories, however, other than to point it out.)

As the district court noted, the fifth potential witness testified at the hearing on Mr. Ashker's first petition for a state writ of habeas corpus and stated that although she thought that the date of the yard work was "probably" June 11 or June 12, "it could have been" June 13 instead. We see nothing in her testimony that proves that the murder could not have taken place on June 13 or that it had to have taken place on June 14. Even if the fifth potential witness had testified as Mr. Ashker contends that she would have, moreover, we believe that the effect of her testimony would have been to add only negligibly to the confusion that Mr. Ashker had already created with respect to the date of the murder. In other words, we also think that even the collective effect of the addition of all five of the potential witnesses proffered by Mr. Ashker would still have been less than the marginal amount necessary to establish a reasonable doubt about Mr. Ashker's guilt. We therefore see no prejudice to him, see Strickland, 466 U.S. at 687, from his trial counsel's failure to interview, and/or to obtain for trial, the fifth potential witness.

## VIII.

A few days after the victim's body was discovered, but nearly a week after June 13, law enforcement officers noticed tire tracks in the victim's yard; one end of the tire tracks was at the bottom of a clothesline pole that had paint chips at its base, paint marks on it, and at least one dent in it. The prosecutor argued at Mr. Ashker's state trial that although tests on the paint chips and marks were not unequivocally definitive, the tire tracks, the paint chips and marks, and the dent tended to show that Mr. Ashker's truck had been in the victim's yard and had backed into the pole. Mr. Ashker introduced no evidence to rebut the state's evidence on these points.

Mr. Ashker alleges that his trial counsel should have obtained an expert witness for trial who could have examined the truck and the pole and could have rebutted the

evidence in question. In support of that allegation, Mr. Ashker points to testimony that he presented at the hearing on his first petition for a state writ of habeas corpus. At that hearing, a college physics professor stated that the tire tracks, center to center, were too wide as a whole to have been made by Mr. Ashker's truck. The physics professor also stated that the paint marks and the dent in the pole were at the wrong heights and were of the wrong sizes and angle, respectively, to have been caused by Mr. Ashker's truck.

At that hearing, the state presented three witnesses in response to the testimony of the physics professor. (Two of those witnesses also testified at Mr. Ashker's state trial.) All three witnesses testified that the paint chips and marks and the dent were consistent with the prosecutor's argument at Mr. Ashker's state trial.

Mr. Ashker's trial counsel also testified at that hearing. He stated that he had considered hiring an expert witness for Mr. Ashker's state trial, but had decided that to do so was unnecessary in light of the fact that one theory of Mr. Ashker's defense was that the state had "planted" the paint chips and marks after focusing the investigation on Mr. Ashker, and in light of the fact that the state's evidence showed only that the paint chips and marks "could" be from Mr. Ashker's truck.

Mr. Ashker's trial counsel also stated at that hearing that he would not even have considered hiring the physics professor as an expert witness at Mr. Ashker's state trial, because counsel knew of the physics professor's reputation for saying "whatever the [defendant] wanted to hear, as opposed to being analytically correct." We note as well that at Mr. Ashker's state trial, his trial counsel extensively cross-examined the state's witnesses about the discovery and testing of the tire tracks, the paint chips and marks, and the dent in the pole and about the reliability of the witnesses' conclusions with respect to that evidence.

The state habeas court made factual findings that the physics professor had "no training in paint analysis," that he did not perform any analysis of the paint marks, and

that he "repeatedly" described the critical part of the pole as a double pipe instead of the single pipe that it actually was. See also Ashker v. Solem, 457 N.W.2d at 475-77. After reading the transcripts from the state trial and the hearing on Mr. Ashker's first petition for a state writ of habeas corpus, we are satisfied that Mr. Ashker has not provided the "clear and convincing" evidence necessary to overcome the presumption of correctness that the law assigns to those findings. See 28 U.S.C. § 2254(e)(1); see also 28 U.S.C. § 2254(d)(2) and Smith, 923 F.2d at 590.

In light of the factual findings of the state habeas court and the transcript from the hearing on Mr. Ashker's first petition for a state writ of habeas corpus, which provides a factual record of why Mr. Ashker's trial counsel did not obtain an expert witness for trial, we agree with the district court's conclusion that Mr. Ashker has not demonstrated any deficient performance by his trial counsel, see Strickland, 466 U.S. at 687, in failing to obtain such a witness. Since Mr. Ashker has made no showing that the relevant tests by an expert witness would have exculpated him, furthermore, we hold that Mr. Ashker has also failed to demonstrate any prejudice to him occasioned by his trial counsel's decision in that regard, see id. We therefore reject Mr. Ashker's allegations in that respect.

IX.

Finally, Mr. Ashker contends that, on direct appeal, his trial counsel should have characterized as both hearsay rule violations and confrontation clause violations the claims with respect to the alleged impeachment evidence described earlier. As we held above, though, Mr. Ashker has procedurally defaulted on that particular aspect of his allegations of ineffective assistance, and we therefore decline to consider that argument.

X.

For the reasons stated, we affirm the judgment of the district court.

-22-

NOONAN, Circuit Judge, concurring.

Lewis Ashker's petition is forcefully presented, but it encounters the numerous barriers set by the Supreme Court of the United States to reduce the review of convictions in the state courts by the federal judiciary. The petition also runs into the normal limitations on appellate review of a trial. We have not heard or seen the witnesses. We look at the evidence from a viewpoint favorable to the conclusion reached by the jury that did hear and see them. From that perspective that Ashker and Kurt Novaock had taken Ashker's truck the afternoon of June 13, 1985, and that Novaock and an unidentified man and the truck should have been seen in Delmont, South Dakota, 128 miles from home on the evening of the same day are strange and unaccountable circumstances unless the men had a powerful motive drawing them to make the trip. That Novaock had the knowledge to make the taking of Jerry Plihal's guns a temptation and that the guns should have disappeared that evening are circumstances suggesting the motive. That Ashker was the unidentified man follows from the truck being his. The falsity of Ashker's alibis makes it likely that he was concealing guilty conduct. To conclude from these facts that Ashker actually took part in Plihal's murder is a large step, but it is hard to say that it was beyond reason for a jury to draw this inference and even to draw it beyond a reasonable doubt.

The prosecutor's tactic of putting on the deposition of Novaock's wife Sharon only to introduce the hearsay testimony of Lisa Jensen to discredit Sharon caused the federal district court to grant Ashker's first federal petition for habeas. We held that the issue should not have been reached. Ashker v. Leapley, 5 F.3d 1178, 1179-80 (8th Cir. 1993). We cannot pass judgment on it now. The jury was told to consider the hearsay only as a challenge to Sharon's credibility. But to find Sharon incredible, the jury had to find Lisa credible and therefore to believe that Lisa had heard Sharon speak of the bloody telltale signs on Novaock. It would have been an unusual jury which did not let the thought of these bloody telltale signs on his companion enter into the weighing of the evidence against Ashker. In this close case the unpurgeable residue of the

-23-

hearsay could scarcely not have played a part.  No federal remedy now exists to alter the result.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.